Deans *v.* McLendon.

BARTLETT DEANS, Plaintiff in Error, *v.* LEWIS McLENDON, Defendant in Error.

1. CONTRACTS: ILLEGAL, VOID.—It is now well settled, that no action can be maintained upon a contract, the consideration of which is either immoral in itself or prohibited by law, or which is made in contravention of public policy; or which grows out of, or is in connection with, an illegal or immoral act. Such contracts are null and void, and will not be enforced in law or equity.
2. ILLEGAL CONTRACTS: WHY COURTS REFUSE TO ENFORCE.—Courts of justice, in refusing to enforce illegal and immoral contracts, are not influenced by considerations of tenderness and respect for the party insisting on the invalidity of the contract, but are governed exclusively by reasons of public policy.
3. SLAVES: INTRODUCTION AND SALE AS MERCHANDISE.—The sale of slaves, introduced by the vendor into this state for merchandise, in contravention of the provisions of the act of 1822, (Hutch. Code, 573,) requiring a certificate of the good character of such slaves, and its registration in the county where sold, is illegal, and contrary to public policy, and the vendor cannot recover the purchase-money agreed to be paid for them by the vendee in this state.
4. DOMESTIC STATUTES: CONSTRUED BY THIS COURT.—This court, in the construction of the domestic statutes of this state, passed for the good government of its citizens and the welfare of the commonwealth, will not yield its well-matured and clear convictions to the opinion of the Supreme Court of the United States, but will exercise its judgment, in exclusion of all other tribunals.
5. The case of *Harris* v. *Reynolds*, 12 How. U. S. S. Ct. R. 79, cited and disagreed to; and the cases of *Brian* v. *Williamson*, 7 How. Miss. R. 14, and *Green* v. *Robinson*, 5 How. Miss. R. 102, cited and confirmed.

IN error from the Circuit Court of Monroe county. Hon. William L. Harris, judge.

On the 26th day of August, 1852, Bartlett Deans, the plaintiff in error, sued, in the Circuit Court of Monroe county, Lewis McLendon and John T. Brooks, on two promissory notes, executed by them on the 11th day of November, 1848, the one due on the 1st of March, 1850, and the other, 1st of March, 1851, for $675 each.

To which defendant filed four several pleas, in substance as follows:—

1. That the notes were given to secure the purchase-money of

two slaves, " Abram and Aberdeen," over the age of fifteen years, who were introduced into this state as merchandise, from the state of North Carolina, by plaintiff, and sold by him to defendant, McLendon, contrary to the provisions of the statute, and without the plaintiff having first procured the certificate of two respectable freeholders in the county of North Carolina whence they were imported, containing a particular description of the slaves ; and also that the said slaves had not been guilty, or convicted of murder, arson, burglary, or other felony, within the knowledge or belief of said freeholders thus certifying; said certificate having the signatures or acknowledgment of the parties thus certifying, made before the clerk of the county aforesaid, specifying therein that the freeholders were respectable.

2. The second plea, in addition to the averments of the first, alleged, that the plaintiff had failed to have recorded the certificate in the Orphan's Court of the county of this state, where the negroes were first sold, after having sworn to the truth of the same, according to his knowledge and belief.

3. The third plea, in addition to the statements of the first plea, averred that the slaves were brought into the state and sold, contrary to public policy.

4. The fourth plea averred in substance, that the plaintiff committed a fraud on defendant in the sale of said slaves, in this, to wit: that he represented said slaves to be good, obedient, and trustworthy servants, when, in truth, they both had been guilty of the crime of burglary ; and one of them, viz: Aberdeen, had been guilty of an attempt to commit a rape; which offences were felonies by the laws of North Carolina, where they were committed, and whence said slaves had been imported into this state; and that the said plaintiff had run said negroes from North Carolina, and brought them into this state as merchandise, they being over fifteen years of age, to avoid the infliction on them of the penalties of the law in that state.

Plaintiff demurred to all of these pleas, and assigned for cause of demurrer :—

1. That said pleas do not present a sufficient bar against plaintiff's right of action.

Deans v. McLendon.

2. That the fourth plea does not show in what said slaves have not filled the bill of sale, since their importation.

3. That the pleas are otherwise insufficient and informal.

And at the same term of the court at which the demurrer was filed, without any disposition having been made of it, the plaintiff filed his replication to the fourth plea, denying all the averments thereof.

At the April term, A. D. 1854, the cause was argued on the demurrer to the first, second, and third pleas, and the demurrer overruled. The plaintiff refusing to withdraw his demurrer or amend, judgment final was rendered for the defendants.

From this judgment, plaintiff, Deans, sued out this writ of error.

*W. F. Dowd*, for plaintiff in error.

The Circuit Court erred in overruling the plaintiff's demurrer to the defendant's first, second, and third pleas.

1. Under the laws of Mississippi, at the time of the contract, the introduction and sale of slaves untainted with crime, was not prohibited, nor was it against public policy. By the 3rd section, (Hutch. Code, 512,) every person was prohibited from *bringing* into, or *holding* in this state a slave, convicted of certain offences enumerated. By the 4th section, the *importation* of any slave is made unlawful, without the certificate of two respectable freeholders. The 6th section imposes a penalty of one hundred dollars, for the sale without the certificate. But the sale of a slave untainted with crime, is not prohibited.

Admitting that the importation of the negroes in this case, was unlawful, the sale to McLendon was a new and independent transaction. If goods are illegally *imported*, and the merchant sells to another, not connected with the illegal act, this new contract is valid. *Armstrong* v. *Toller*, 11 Wheat. 258; 6 Con. U. S. R. 302; Story, Confl. L. §§ 248, 249, 250.

2. The sale of negroes untainted with crime, is not *malum in se*, nor is it prohibited by statute. It is therefore a much stronger case for the plaintiff, than the leading case on this subject. *Faikney* v. *Reynous*, 4 Bur. R. 2069; (Condensed ed. 66;) *Petrie* v. *Hannay*, 3 Term. 418; *Former* v. *Russell*, 1 Bos. & Pul. 296.

In all the cases cited by defendant's counsel, the parties to the contract did what the statute expressly prohibited. In the case of *Law* v. *Hodson*, 11 East, 300, it was determined that a sale of brick, of less dimensions than the statute required, is illegal and void. Here the act itself was illegal, and a fraud upon the buyer. The same distinction applies to *Wheeler* v. *Russell*, 17 Mass. 259, in which there was a sale of shingles, of less size than the statute required, declared void; and to the following cases relied on by defendant. *Russell* v. *De Grand*, 13 Mass. 35, 36; 14 Ib. 324; 4 Peters, 426; 2 Ib. 538.

3. The sale of a slave untainted with crime, not being *malum prohibitum* nor *malum in se*, the penalty of one hundred dollars imposed by the sixth section, for the use of the literary fund, is merely a revenue regulation, and the sale of the negroes, without the certificates, is not void. *Johnson* v. *Hudson*, 11 East, R. 180; *Brown* v. *Duncan*, 10 Barn. & Cress. 98; *Hodgson* v. *Temple*, 5 Taunt. 181; *Harris* v. *Runnels*, 12 How. U. S. R. 83.

4. The question involved in this case is *res adjudicata.* The Supreme Court of the United States, in the case of *Harris* v. *Runnels*, 12 How. S. C. R. 80, have settled the construction of the statute under consideration. They determined, after a full investigation, that the contract sued on in this action is valid, though the matters set up in the first, second and third pleas are true. But it is insisted, that this decision is in conflict with the celebrated opinion of Judge Sharkey, in the case of *Brien* v. *Williamson*, 7 How. 14. That case settled two principles; first, That the constitution of 1832, prohibited the introduction of slaves *per se*, without any legislative enactment, and second, That the prohibitory clause in the constitution and the statute together, upon that subject, disclosed the public policy of the state to be against the introduction of slaves as merchandise. It does not touch the question at issue in this case, nor does it profess to give any judicial construction to the statute under consideration.

5. The second, third, fourth, fifth, sixth and seventh sections of the act of June 18th, 1822, were repealed by the constitutional provision of 1832. In 1844-46, the constitution was amended, the act of 1837 repealed, and the whole policy of the state on

this subject was changed. At the same sessions, March 4th, 1846, the said third, fourth, fifth, sixth and seventh sections were revived ; and the fines and penalties arising, are to be paid into the common school fund. Since that time, it has not been against the public policy of the state to introduce slaves into this state as merchandise, unless convicted of crime.

*L. E. Houston,* for defendant in error.

1. The first point we shall make in the argument of this case is, that the *introduction* of the slaves, being in contravention of the third section of the second article of the 37th chapter of the Statutes of Mississippi, page 513, (*Buck's case,*) and the notes here sued on having been given to the *importer* for the price of the *slaves* thus *illegally* introduced, that the said *illegal introduction taints* the contract of sale of said slaves ; or, in the language of Justice Trotter, in *Green* v. *Robinson,* 5 How. R. 102 : "The sale consequent upon the introduction *evinces* the *intent,* and *fulfils* the *illegal purpose* of the *introduction.* It is the *accomplishment* of the *motive, for which* the act of *introducing* is *made illegal,*" and that the notes are therefore void, and cannot be enforced. The fourth section of the statute above referred to, says, that "It *shall not be lawful* for any person to import into this state from any of the United States or territories thereof, as *merchandise,* any slave or slaves, either negro or mulatto, or of any other description whatever *above* the *age* of *fifteen years,* without having previously obtained a certificate," &c., " of good character," &c. What can be more explicit ?—and yet it is contended by counsel for plaintiff, that the *introduction* completes the illegal act, and that the *sale* is a matter wholly *disconnected* from the *illegal introduction ;* and therefore the contract of sale is *legal* and *binding,* although the sale is the very purpose for which the slaves were introduced, and indeed *forms a part* of the act denounced by the statute ; for it is but the *evidence of the motive,* or the *consummation* of the *purpose* of the introducer.

We will compare the act referred to, with the provision of the constitution, which formerly prohibited the introduction of slaves into the state, as merchandise, and see which is the strongest.

The constitution said; that, "the introduction of slaves into the state, *as merchandise*, or for sale, should be prohibited from and after the 1st day of May, 1833; provided that the actual settler should not be prohibited from purchasing slaves, in any state in this Union, and bringing them into this state, for their own individual use, until the year 1845." It would be observed that, it was the *introduction as merchandise*, which the constitution prohibited; and yet our Supreme Court, in divers cases, decided that, when they were *introduced*, in contravention of said constitutional prohibition, that the sale of them afterwards *was not so disconnected* with the introduction, as to make the sale valid and legal, but on the contrary they decided, that the sale was but the *consummation* of the purpose of introducing, and therefore *illegal* and *void*. *Green* v. *Robinson*, 5 How. Rep. 101, 102, 103; *Brien* v. *Williamson*, 7 Ib. 16: and the same principle is recognized in *Hoover* v. *Pierce*, 27 Miss. Rep. 13. In all of these cases it will be seen, that it was the *introduction* of the slaves *as merchandise*, that was *prohibited*, and it was that illegal introduction that *tainted* the subsequent sales, and rendered them void; and so in the case at bar, the statute has said, that it is unlawful to introduce *slaves* as *merchandise, over fifteen years of age*, without a *certificate* of *good character*, &c.; and yet the negroes, for the price of which the notes in controversy were given, were introduced in violation of that statute; the *sale* then, consequent on said *introduction*, was *tainted* thereby, and is void, and the notes are void.

In the case of *Law* v. *Hodson*, 11 East. R. 300, the statute required, that all bricks made for sale, should be of certain dimensions in the statute specified; and it then gave a penalty of twenty shillings for *making them for sale*, of a less dimension. There, it will be perceived, the law was against making and the penalty was denounced against *making the brick* not of a statutory size. There, then, the violation of the statute was complete by the making; and according to the doctrine of plaintiff's counsel, the maker might sell the brick with impunity, and the law would *aid* him to enforce the payment of the *price*, because the violation of the statute was complete in making; yet the court in that case say, that the seller cannot recover the price of the bricks sold. So in

the case at bar, the statute says that negroes shall not be brought into the state, as *merchandise*, except they are of a certain quality, or at least are certified to be of a certain quality; and yet *Deans* introduced slaves that were not of that quality, or were not certified so *to be*, as the law required, and sold them to McLendon: this court will not, therefore, aid him in enforcing an illegal contract, or a contract founded on an illegal consideration. This doctrine is fully recognized in the case of *Armstrong* v. *Toler*, 11 Wheat. Rep. 297, 298. To the same effect have been the decisions in all the cases which have been decided by this court, where slaves were introduced into this state, as merchandise, and sold in violation of the constitutional prohibition.

2. The second point which we make, or the point set up by the second plea, in this cause is, that the *sale* of the slaves, for which the notes in controversy were given, was made without the *registration* of the *required certificate*, and was therefore in violation of the fifth section of the statute above referred to, found on page 519, of Hutch. Code. The statute not only requires that the party bringing slaves into the state, as merchandise, above the age of fifteen years, should bring a certificate of their good character, but the fifth section of that statute "requires that, any person who shall sell any slave or slaves brought into this state, as merchandise, shall cause to be registered, with the registrar of the Orphans' Court of the county, where such slave or slaves is or are first sold, every certificate, as aforesaid." Here, then, is a positive injunction of the law, which the second plea says, was violated by plaintiff; and which violation is admitted, by the plaintiff's demurrer to that plea; which violation of the said statute renders the contract of sale void.

See *Bank of United States* v. *Owen,* 2 Peters, 538, 539, 541. The court there say, that "no court of justice can in its nature be made the handmaid of iniquity; courts are instituted to carry into effect the laws of a country; how then can they become auxiliary to the *consummation* of violations of law? There can be no civil right, where there is no legal remedy, and there can be no legal remedy for that which is itself illegal."

See also *Craig et al.* v. *The State of Missouri*, 4 Peters, 410,

*et seq.;* also, *Springfield Bank* v. *Merrick and others,* 14 Mass. 324; *Russell* v. *De Grand,* 15 Mass. 37; *Wheeler* v. *Russell,* 17 Mass. 280. And in the case of *Armstrong* v. *Toller,* 11 Wheat. (6 Condensed Rep. 304,) Chief Justice Marshall says, "that questions on illegal contracts have arisen very often, both in England and America; and no principle is better settled, than that *no action can be maintained on a contract,* the consideration of which is either *wicked in itself,* or *prohibited* by law; see also *Former* v. *Russell,* 1 Bos. & Pull. 299, 301; *Green* v. *Robinson,* 5 How. Miss. Rep. 103, 104; *Brien* v. *Williams,* 7 How. Rep. 31; *Odeneal* v. *Barry,* 24 Miss. Rep. (2 Cushm.) 9–23; *Hoover* v. *Pierce,* 27 Ib. (5 Cushm.) 25, 26; *Cope* v. *Rowlan,* 2 M. & W. 155, 156; *Hunt* v. *Knickerbocker,* 5 Johns. 327; Story, Cont. 104, § 162; 140, §§ 219, 220.

3. The third point made by the pleadings, or the point made by the third plea was, that the *introduction into the state as merchandise, and sale of the slaves,* for which the notes in controversy were given, without *bringing and having registered a proper certificate,* was contrary to the "*public policy*" of the State of Mississippi, and the notes being the product or result of that *violation of public policy,* are void; see *Law* v. *Hodson,* 11 East, 301; *Grover* v. *Slaughter,* 15 Peters, 450; *Green* v. *Robinson,* 5 How. Miss. Rep. 101, 103; *Glidewell et al.* v. *Hite et al.,* 5 Howard, 146, 147, 148; *Brien* v̌. *Williamson,* 7 How. Miss. Rep. 29. In the case of *Glidewell* v. *Hite,* in 5 Howard, Chief Justice Sharkey says that, "In cases of this description, *public policy* is in reality the leading object in the adjudication, and it is made exclusively with a view to guard that policy. As between the individuals, the contract might be beneficial to both parties, and free from the taint of fraud or injustice when tested by the rules which regulate private rights; but the public is the party beneficially interested, and the parties to the suit are the mere instruments through whom the community receives protection. Laws of public policy must be viewed in this light, otherwise the public interests are lost sight of, and they become like all other laws, mere rules for the government of private rights. A law cannot be one of public policy, unless the whole community have an interest in seeing it enforced;

Deans *v.* McLendon.

and if so, must not that interest be looked to and regarded in the adjudication of private rights?—will not a court extend its aid to prevent a result prejudicial to the public?" In the case of *Brien* v. *Williamson,* 7 How. 16, Judge Sharkey says: "We hold the contract void, on *either of two grounds.* First, that the constitution *per se* prohibited the introduction of slaves into the state as merchandise, or for sale; secondly, that the *constitution,* taken in connection with the *legislation* of the state, so clearly settles the *public policy* of the state, as to avoid the contract for the sale of the slaves, as being against that policy;" and in the same case, page 31, he says: "That contracts in violation of *law,* or against *public policy,* cannot be enforced, is a position as *well established* as any other in the law, and requires no authority to prove it;" and refers to the case of *Craig* v. *The State of Missouri,* 4 Peters, 410, as conclusive of the point. It is clearly settled, then, that if the *introduction* and *sale of the slaves,* for which the notes in controversy were given, was in violation of *the public policy* of the State of Mississippi, the notes are void, and their payment cannot be enforced.

The only question then is, was the *introduction* and *sale* of the said slaves in violation of the public policy of Mississippi?

The public policy of Mississippi, as *indicated* by sections 2, 3, 4, 5, 6, and 7, of article 2, chapter 37, found on pages 512, 513, Hutch. Code, seems to be, to prevent the introduction into this state of slaves, born without the limits of the United States, or slaves who had been guilty of any *felonious offence,* within the state or territory whence they came: and as a *means* of carrying out that *public policy,* and as a part of that policy, the legislature adopted a mode whereby to know that slaves, who had been guilty of those offences, were not introduced; and that was, to require the importer thereof to bring with him, and have registered, certificates of their good character. It was *as much* the *public policy* of the state, to *know* that every slave introduced as merchandise or for sale, over fifteen years old, was virtuous, or was free from having committed any of the offences mentioned in section four of the said statute, as it was to prevent the introduction of slaves, *who had been guilty* of said offences; for the end of the policy was the pub-

lic safety; and although the legislature had passed a law saying that slaves who had been guilty of those offences, should not be introduced, yet without the other law, requiring them to bring proof of the good character of those they introduced, the law of prohibition would have been to some extent stripped of its force and effectiveness.  Hence, we conclude, that the *public policy* of the state *was to know the character of every slave,* over fifteen years old, introduced as merchandise; and he who *violated* that part of the statute violated the *public policy* of the state, and could not be allowed to call upon the courts of the country to aid him in enforcing any contract growing out of such violation of *public policy.* It is presumed that it would not for one moment be contended that if the said slaves had been guilty of a felony in the state whence they came, that their introduction would not have been contrary to the public policy of the state; and yet the statute is just as clear, that no slave shall be introduced, without a certificate of good character, as it is that no slave shall be introduced that has been guilty of a felony.

But it is contended by plaintiff's counsel, as it was by Mr. Holt, in *Glidewell* v. *Hite,* 5 How. 137, 138, that the adoption of the new constitution, which prohibited the introduction of slaves into the state as merchandise, after the 1st of May, 1833, repealed the statute of 1822, under which we make this defence, and that the *repeal of that constitutional prohibition did not revive the statute of 1822,* and that *therefore said statute is not now in force.*  To this we will reply, by referring counsel and the court to the statute of 1846, Pamphlet Acts, page 243, which in words, revives the very sections of the laws of 1822, upon which we rely, to wit, sections three, four, five, six and seven.

Upon as thorough an examination as I have been able to make, of all the cases decided in this country and England, my mind has been irresistibly brought to the conclusion, that no contract made in violation of the common or statute laws, or in contravention of public policy, or good morals; or which grew immediately out of either of them; or the consideration of which contract was illegal, contrary to public policy, or good morals, can be enforced in the courts of the country; for courts are instituted to carry into effect

the laws and public policy of the country, and cannot, therefore, become auxiliary to the consummation of violations of those laws, and that public policy, by enforcing contracts in contravention of them, thereby giving encouragement to the violators.

There is, indeed, perhaps one exception, which may be found to the general rule, laid down just above, and that exception is found in violations of *purely revenue laws*, or laws for the benefit of the revenue, where no *principle* of *public policy* is involved, and where the violation is not *malum in se*. Wherever the *law* is *solely* for the *protection* of the *revenue*, the courts will enforce contracts even made in violation of that law, because the *penalty*, if there be one, will reimburse the loss of revenue caused by the refusal to comply with the law, and no injury is wrought to public morals; but wherever the law is for the protection of the *public alone*, or where it is in *part for the protection of the revenue*, and in *part for the protection of the public*, and a contract is made in violation of that law, the courts will not aid the parties in enforcing it, because no penalty can fully atone, or make amends for a *violated public interest, policy or morals*. See *Brown* v. *Duncan*, 10 Barn. & Cress. 93; (21 Eng. Com Law R. 29;) *Wetherill* v. *Jones*, 3 Barn. & Ald. 221; (5 Eng. Com. Law R.;) *Foster* v. *Taylor*, 5 Barn. & Ald. 898; (7 Eng. Com. Law R.;) also *Johnson* v. *Hudson*, 11 East, R. 180.

And indeed, all the cases *cited* by plaintiff in error, except " *Harris* v. *Reynolds*," 12 How. U. S. R., which we shall note presently, are either cases violative of the revenue laws, or cases where the contracts were so totally disconnected with the violations of the law as not to be tainted by the violation.

*Mr. Houston*, also reviewed and commented on the case of *Harris* v. *Reynolds*, 12 How. S. C. R. 97.

*W. F. Dowd*, in reply.

The counsel for the plaintiff in error, submits the following reply to the argument of defendant's counsel.

The defendant has in his possession two valuable negroes, for which the note was given. He has never offered to return them.

It is not averred that he knew no certificates of freeholders had been obtained at the time of the purchase. The whole defence has been trumped up, to avoid the payment of an honest debt.

The great principle to be kept constantly in view in this investigation is, that the importation and sale of slaves in this state, is not prohibited by statute, nor is it against public policy, since the act of 1846.

The introduction of slaves convicted of crime, is prohibited, and a fine of $1000 imposed.

The certificates described in the statute are required, and a penalty of $100 imposed on buyer and seller, if the statute is not complied with.

The result of the position assumed by counsel is, that a convict may be introduced and lawfully sold, provided the certificates are previously obtained, but if a good negro is sold without them, the contract is void. The penalty for selling a good negro without the certificate, worth $1500, would cost the seller that amount; while the sale of the convict for cash, would only cost him $1000.

If the negroes in this case had been convicts, the arguments of counsel would some have application. *It was the object of the legislature to prevent the introduction of convicts, not others.*

In the case of *Craig* v. *The State of Missouri*, 4 Peters, 410, the facts were, that the legislature had issued bills of credit to its own citizens, in exchange for their promissory notes. One of these notes was declared invalid, because it was given for a bill of credit, in violation of the express provisions of the constitution of the United States. Here, *the thing prohibited by the supreme law* was accomplished by the contract. The contract itself, was the emission of the bill of credit.

In the case of the *Bank of the United States* v. *Owens*, 2 Peters, 527, the note was declared void for usury. The statute expressly declares all contracts of this sort void.

The case of *Hunt* v. *Knickerbocker*, 5 Johns. R. 326, 328, was founded on a statute which made the sale of lottery tickets illegal, immoral, and a *public nuisance.* The contract for the sale of lottery tickets, was a palpable violation of law, and tended to defeat its declared policy.

In the case of *Russell* v. *De Grand*, 15 Mass. 37, a policy of insurance given on a vessel bound on an illegal voyage, was declared void. Why? Because the contract made the underwriters aiders and abettors in an illegal and treasonable scheme. If McLendon had made a contract with Deans, to aid in the introduction of convict slaves, the case would have some application.

The counsel for defendant is mistaken in his view of the case of *Law* v. *Hodson*, 11 East, R. 301, upon which his defence is mainly founded. The statute 17 Geo. III. prohibits the making of bricks under a prescribed size, for sale. The object of the law was to protect the community from fraud. A sale of brick, not corresponding with the requisitions of the statute, was made by a manufacturer, and declared void by the court. But suppose the law had required every manufacturer to obtain a license to make or sell, or to obtain the certificate of a freeholder, that the brick were of lawful size, and he made a sale, the brick corresponding in every respect with the statute, without the certificate or license— would the sale have been void? A glance at the opinion of Lord Ellenborough, will show that no such judgment would have been rendered. The reason of the decision is the violation of the law, and the fraud upon the buyer.

In all these cases, the very act prohibited and forefended by the statute, was done and committed by the contract, and has no application to the case under consideration, unless the slaves were convicts from another state.

To show the correctness of the principle for which I contend, I will now refer to a few, out of many cases, which might be adduced:—

The sale of tobacco, was not a violation of the public law or policy. But the statute law of England prohibited the sale by any person, without license, and imposed a penalty. A contract for the sale of tobacco, by a person not licensed, was enforced, and declared valid. *Johnson* v. *Hudson*, 11 East, R. 180.

The statute (3 Hen. VIII.) made the practice of surgery by any person without a license, unlawful, and imposed a penalty of £5 per month. Yet a surgeon without license, can recover for his services. *Greman* v. *Le Clerc Bois Valou*, 2 Campb. 144.

Deans *v.* McLendon.

What is the reason of the rules in these cases? *The act done,* is not a violation of public policy, or prohibited by statute. *The act is not done in the manner* prescribed by the statute.

Thus, the practice of surgery, or the sale of tobacco, is not prohibited under all circumstances; nor is it against the settled public policy. But these things must be done in a particular manner, under a penalty; if not, the penalty attaches, but the contract made, is valid.

Thus, the law making it unlawful for a surgeon to practise without license, was designed to protect the public health from impostors. If an impostor were to practise *with or without license,* and the fact could be shown, he could not recover for his services, because this would be against public policy. But if a learned and scientific surgeon renders services without license, he may recover his bill.

From a careful review of all the decisions on this subject, we may deduce the salutary rule, that whenever the contract consummates an act prohibited by law or public policy, it is void; *but whenever the act is itself lawful,* but required by statute to be done *in a specified manner, under a penalty,* the contract is valid, and the party is liable to the penalty.

It follows, that the importation and sale of slaves, *not convicts,* being no violation of public policy or positive statute, the contract sued on in this case is valid, although the importation and sale was not done in the precise *manner* prescribed by law.

Did not the legislature intend that the fines imposed should be the only penalty? The fine of $1000, at the adoption of the act, for importing convicts, was nearly, or quite double the average value of the negroes. The penalty of $100, for failing to procure the certificates, in the sale of a good negro, absorbed the net profits of the trader.

Mr. Justice Sharkey, in *Brien* v. *Williamson,* 7 How. 26, sustains this position. He says: "The object of the legislature *can be accomplished by fine.* To those who are eager for gain, there is a great terror in fines."

The last plea in the record avers that the negroes, for which the notes were executed, were convicted of crime, &c., &c. On this

plea issue was taken, denying the matters averred in the plea. No disposition was made of this issue of fact, but a final judgment was awarded for the defendant, on the issue of law.

SMITH, C. J., delivered the opinion of the court.

This writ of error is prosecuted to reverse a judgment rendered in the Circuit Court of Monroe county.

The plaintiff in error instituted suit in that court upon two notes, made by the defendant in error, who pleaded that the notes were given to secure the price of two slaves, introduced into this state in violation of the statute of 1822, concerning slaves, free negroes, and mulattoes. Hutch. Dig. 512. The plaintiff's demurrer, which was overruled, raises the question of the illegality of the notes.

It is not now to be controverted, that no action can be maintained upon a contract, the consideration of which is either immoral in itself or prohibited by law; or which is made in contravention of public policy. It is equally well settled, that every contract which grows out of, or is in connection with an illegal or immoral act, is absolutely void, and will not be enforced in law or equity.

Courts of justice, in the observance of these rules, are not influenced by any consideration of respect or tenderness for the party who insists upon the illegality of a contract; but exclusively by reasons of public policy. The object is to punish the active agent in the violation of a law, by withholding from him the anticipated fruits of his illegal act; and thus, by deterring all persons from violating its mandates, to give sanctity to the law and security to the public.

In deciding the question of the illegality of the notes, upon which this suit was brought, a reference to the statute on the subject of the importation of slaves into this state as merchandise, is necessary.

By the act of 1822, sect. 4, Hutch. Code, 513, it is expressly allowed to be unlawful for any person or persons to import into this state, from another state or territory, any slave or slaves as merchandise, of any description whatever, above the age of fifteen

years, without having previously obtained a certificate, signed and certified in the mode prescribed, that such slave or slaves, "have not been guilty or convicted of murder, burglary, or arson, or other felony," within the knowledge or belief of the parties certifying, in the state whence they are brought.

The fifth section directs that such certificates shall be recorded, and prescribes the place and method in which that shall be done.

And the sixth section provides, " that if any person shall sell or purchase any slave or slaves without having complied with the provisions of this act, he, she, or they, so offending, shall pay the sum of one hundred dollars for every slave so sold or purchased."

The illegality, and consequent invalidity of any contract made in direct violation of the provisions of this statute, is a question which admits of no debate.

But a distinction is attempted to be taken between the importation of slaves as merchandise, under the conditions denounced in the statute, and the subsequent sale of them, after they have been thus illegally introduced.   Such importation is admitted to be unlawful; but it is insisted that a sale made after the importation is neither a violation of the statute, nor in contravention of the public policy of the state.

This distinction is clearly without foundation.   The plain and manifest object of the legislature, was to prevent the introduction, and the consequent incorporation with the slave population, of slaves of bad character—of convict felons; and for that purpose declared it to be unlawful for any person to introduce into the state, as a subject of traffic, any slave above the prescribed age, unless such person had previously obtained a certificate, showing that such slave had not been guilty or convicted of a felony in the state or territory from which he was imported.   It cannot be doubted, that the dreaded evil was sufficiently great and imminent to require the interposition of the legislature.   At any rate it is sufficient for us to know that the legislature so deemed it, and for that purpose passed the act in question.   It is not the province of this court to determine whether the circumstances of the community required the enactment of such a law; or to pass upon the adaptation or fitness of its provisions to effect the object intended.

The statute undoubtedly declared and established the public policy upon the subject. *Brien* v. *Williamson*, 7 How. (Miss. R.) 14. But the act does not close with the declaration, that the introduction of uncertificated slaves for merchandise, shall be unlawful. The sixth question imposes a penalty for the *sale itself*, of any slave imported in violation of the act. There is, therefore, not the slightest pretence for saying, that although the importation may be illegal, yet the subsequent sale is no violation of the law.

But if no penalty had been attached to the sale, the argument for plaintiff in error would not be stronger. It would be a strange perversion of the principles of construction to hold that a contract for the purchase, or a note given for the price of a slave imported in violation of the statute, would be valid, and consequently that the courts would be bound to enforce it. By such a construction, the declared purposes of the statute would be defeated. The act of importation, and the motive with which it is performed, in the cases prohibited by the act are both, and equally, illegal. If the intention to sell, or the motive for the importation be illegal, it is impossible to conceive how the sale, which is the consummation of such intention, can be legal.

In the case of *Green* v. *Robinson*, 5 How. (Miss. R.) 102, in which a similar question arose, under the prohibition in the constitution in regard to the introduction of slaves as merchandise, the court held the following language, which is altogether pertinent to, and decisive of the question here: "The cardinal policy of the state was then to suppress this trade; and this is what is prohibited. In what, then, it may be asked, does it consist? The offence consists in the introduction of slaves into this state for sale as merchandise. The sale, then, is the consummation of the prohibited act. It is that which indicates, nay, demonstrates, the illegality of the introduction. The act of introduction may, in some cases be lawful; it will always, however, be illegal, if the intent is to sell. The sale, consequent upon the introduction, evidences the intention, and fulfils the illegal purpose. We cannot, then, comprehend the argument which treats the sale in this case as unconnected with the illegal act of introduction. It regards the latter, that is, the introduction, as a proper subject of

animadversion, when the motive is a sale of the property, and yet legalizes the sale itself—the accomplishment of the motive for which the former act is made illegal. If the object of an act be the reason for prohibiting such act, it is difficult to conceive how the act can be illegal, and the object legal after it has been attained. It seems impossible to consider the sale as an act, separate and distinct from the introduction. It would be to condemn the means, and yet sanctify the end."

The rule recognized in *Green* v. *Robinson,* has since been repeatedly affirmed by this court. It applies fully to the question under consideration, which, indeed, could not, properly, be considered an open question in this court.

It is true, however, that in the case of *Harris* v. *Reynolds,* 12 How. S. C. R. 79, the Supreme Court of the United States have given a construction to the statute, in direct opposition to that which we consider its proper and legal construction; and have held that the vendor of slaves imported into this state, in violation of the act, is entitled to recover upon a note given for the purchase-money.

The question which we have been considering arises upon a statute of this state, designed for the regulation of a subject exclusively within its jurisdiction. We may, therefore, as the appellate tribunal of the state, justly claim the right, in exclusion of all other courts, to determine the construction which should be applied to those acts of the legislature passed for the good government of the citizens, and the welfare and safety of the commonwealth; and also to declare and enforce the public policy established by its laws. Hence, however great the respect and deference which may be due to the decisions of the Supreme Court in all cases— and which we willingly pay—we are not bound, and will not yield our well matured and clear convictions, in reference to the construction of our domestic statutes, to the opinions of that tribunal. We could not do so, without grossly betraying the rights of the community, which it is our solemn duty to protect. The Supreme Court, like all other judicial tribunals, in applying the legal rules which grow out of the statutory regulations of any of the states, when they decide in advance, must, of necessity, place their own construction upon them, and determine the validity of those rules.

But, in the construction of state statutes, which involve no question arising under the constitution of the United States, or of the laws and treaties made pursuant thereto, it is not the exclusive, nor even the proper expounder. The right to expound, definitively and conclusively, their statutes, and to determine upon what is the public policy, must, of necessity, under our system, belong exclusively to the state courts.

It is not our intention to review the decision in *Harris* v. *Reynolds;* it is sufficient for our purpose to remark, simply, that the reasoning of the Supreme Court in that case, at best, is unsatisfactory and inconclusive.

This precise question, under the statute, has never before been up for decision. But numerous cases, in which a question completely analogous to the one under consideration, have been determined by this court, which, if there could otherwise be any doubt upon the subject, settles it conclusively.

Judgment affirmed.