# CASES

## ARGUED AND DETERMINED

### IN THE

# United States Circuit and District Courts

---

### THE WESTERN UNION TELEGRAPH COMPANY *v.* THE UNION PACIFIC RAILWAY COMPANY.

*(Circuit Court, D. Kansas.* June 30, 1880.)

1. PLEADING—CORPORATION.—An averment in a pleading that a corporation had power to execute a contract, must be taken to mean that it had such power by virtue of the law of its being.

2. PACIFIC RAILROAD SYSTEM—ACT OF CONGRESS, JULY 12, 1862.—The several state railway corporations incorporated into the Pacific railroad system by the act of congress chartering the Union Pacific Railroad Company, approved July 12, 1862, and which were authorized to construct branches, and received aid from the United States, are subject to the terms and conditions imposed by said act of congress.

3. SAME—TELEGRAPH FRANCHISE —The Union Pacific Railroad Company is without authority to alienate its telegraph franchise, or any property necessary to the performance by it of the duties imposed by law.

4. SAME—SAME—ACT OF CONGRESS, JULY 2, 1864, § 4.—But the fourth section of the act of July 2, 1864, authorizes said Union Pacific Railroad Company, or any company authorized to construct a branch of the Union Pacific Railroad, to transfer to the United States Telegraph Company, or its successor, the right to construct and operate the line of telegraph required by the Union Pacific Railroad charter to be constructed and operated.

v.3,no.1—1

**5. CONTRACT—PUBLIC POLICY.**—A provision in a contract between a telegraph company and a railroad company, to the effect that the telegraph company will transmit the family, private and social messages of the executive officers of the railroad company free, is against public policy, and immoral, and taints the entire contract, so that a court of equity will not enforce it, or grant any relief to a party claiming under it.

Demurrer to Bill.

*C. Beckwith, Williams & Thompson, Geo. R. Peck* and *W. C. Webb,* for complainants.

*J. P. Usher* and *Everest & Waggener,* for defendant.

McCRARY, C. J.   The bill sets forth a contract in writing entered into between plaintiff and the Union Pacific Railway Company, Eastern Division, of date October 1, 1866, whereby the plaintiff, under certain terms and conditions, was to construct, maintain and operate a line of telegraph along the line and upon the right of way of said railway company.

The bill avers that the parties to said contract are, and were at the time of the execution thereof, existing corporations, with power and authority to make and enter into said contract.   The Kansas Pacific Railway Company was the successor of said Union Pacific Railway Company, Eastern Division, and the Union Pacific Railway Company is the successor of the former.   It is averred that by the terms of said contract it was agreed that plaintiff should have the right to add as many wires to said line established as should be necessary for the transmission of its own business, without interference with the working of the wire which, by the terms of the contract, was reserved for the use of the railway company.

The plaintiff further alleges that on the tenth day of February, 1880, it became and was necessary for the transmission of its business to add another wire to said telegraph line, between Wyandotte and Brookville, and that for that purpose it procured the necessary materials, and demanded of the railway company permission to erect said additional wire, which was refused; and it is alleged that the several defendants have confederated and combined together, and by force and threats have prevented plaintiff from putting up

said additional wire, and that they still prevent the same, and threaten to prevent the same hereafter. It is further alleged that defendants are about, by force and against plaintiff's will, to cut the wires used on plaintiff's said line of telegraph. The prayer of the bill is as follows: "Plaintiff prays the court to enjoin and restrain the defendants, and each and every of them, by whatever name they or either of them may be known, from interfering with plaintiff's right to add any additional wires necessary for the transaction of its business over said line of telegraph, on said poles along and on said railroad line; and plaintiff prays the court to enjoin all the servants, agents and employes of defendants, and each of them, from in any way preventing plaintiff, its servants, agents or employes, putting up such additional wires as may be necessary for plaintiff's business. Plaintiff prays the court to enjoin and restrain the defendants, each and every one of them, from cutting any wires heretofore used by the plaintiff under said contract, and running the same, or any of them, into the office or offices of defendants, or any of them, and thereby depriving plaintiff, either permanently or temporarily, of the said wires, or any of them. Plaintiff prays the court to enjoin and restrain temporarily defendants, and each and all of them, their servants, agents and employes, from cutting said wires, or any of them, and from preventing, or in any way or manner whatsoever obstructing or hindering, plaintiff, its agents, servants, and employes, from adding such other wire to said poles as may be necessary, and from running said wires, or any of them, into the office or offices of the defendants, or either of them, different from what they now are. And plaintiff prays the court to continue such temporary injunction until the final hearing of this cause, and that at such final hearing such injunctions be made perpetual. And plaintiff prays for such other and further relief as may, under the facts and circumstances of the case, be deemed proper and equitable, and for costs."

The defendant the Kansas Pacific Railway Company demurs to the bill upon the ground that it does not state facts sufficient to constitute any cause of action. The contention

of the defendant is that it appears from the face of the bill that the Union Pacific Railway Company, Eastern Division, had no power or authority to enter into the contract in question, and that the same appears to be against the statute, contrary to public policy, and void.

1. Although the bill avers that the railway company had power to enter into the contract in controversy, it must be assumed that by this allegation the complainant intended to say that by virtue of the law of its being it had such power; and it is, therefore, necessary to look into the statutes under which it was organized, and by which its powers were defined and limited. A corporation can possess such powers only as are expressly conferred by statute, or incidental to its express powers.

2. It is conceded that the Kansas Pacific Railway Company, Eastern Division, was originally chartered by an act of the legislature of Kansas as the "Leavenworth, Pawnee & Western Railroad Company," and had, by virtue of its state charter, authority to make the contract in question; but it is insisted that, by accepting the terms of the act of congress making it a branch of the Union Pacific Railroad, it became subject to the laws of the United States relating to that road and its branches, and was thereby disabled from making such a contract. By section 9 of the act known as the original Pacific Railroad Act, approved July 12, 1862, it was provided that the Leavenworth, Pawnee & Western Railroad of Kansas might construct a railroad and telegraph line over a prescribed route, "upon the same terms and conditions, in all respects, as are provided in this act for the construction of the railroad and telegraph lines just mentioned."

By other provisions of the act, and by its amendments, large subsidies were bestowed upon the companies building the branches, as well as upon the company which was to build the main line. I am of the opinion that by accepting the terms of the acts of congress, and receiving its benefits, the Leavenworth, Pawnee & Western Railroad Company became subject to all the terms and conditions imposed by those acts, and that neither it nor its successors could enter into a

contract not authorized thereby, anything in the original state charter to the contrary notwithstanding.

3. This brings me to the question whether the contract set out in the bill was authorized by the charter of the Union Pacific Railroad Company, and its amendments. I have recently had occasion to consider the proper construction of those acts, and the powers of the companies authorized to construct and operate lines of railroad and telegraph under them, and the conclusion reached was that the Union Pacific Railway Company was not authorized to alienate its telegraph franchise, or any property necessary to the performance by it of the duties imposed by those acts. *Telegraph Co.* v. *Railroad Co.* 1 FED. REP. 745.

The contract now before me provides not merely for granting to the telegraph company the right of way along the line of the railway, but it also provides that the railway company shall do no commercial or paid telegraph business from any station where the telegraph company shall have an office, without the consent of the latter. This, in my judgment, amounts to an alienation of the right to transact business for the public generally for pay, as a telegraph company, and that right is the most valuable part of the franchise of a telegraph company. It follows that the contract is beyond the power of the railway company, unless the authority to make it can be derived from the act of 1864, which will next be considered.

4. The fourth section of an act "for increased facilities for telegraph communication between the Atlantic and Pacific states and the territory of Idaho," approved July 2, 1864, is as follows:

"*And be it further enacted,* that the several railroad companies authorized by acts of congress of July 1, 1862, are authorized to enter into arrangements with the United States Telegraph Company so that the line of telegraph between the Missouri river and San Francisco may be made upon and along the line of said railroad and branches as fast as said roads and branches are built; and if said arrangements be entered into, and the transfer of said telegraph line be made

in accordance therewith to the line of said railroads and branches, such transfer shall, for all purposes of the act referred to, be held and considered a fulfilment on the part of said railroad companies of the provisions of the act in regard to the construction of a telegraph line; and in case of a disagreement said telegraph company are authorized to remove their line of telegraph along and upon the line of railroad therein contemplated, without prejudice to the rights of said railroad companies." 13 Statutes, 374.

It is stated, in argument by counsel, that complainant is the assignee and successor of the said United States Telegraph Company, and possessed at the time of making the contract in question, and still possesses, the rights conferred upon that company by the section just quoted; and it is claimed that under this act, if not under the original Pacific Railroad charter, the railway company had power to make the contract. These facts are not averred in the bill, but as the question of the true construction of the section above quoted has been discussed, I deem it best to state my views thereon, especially in view of the fact that, under the allegation in the bill that the railway company had power to enter into the contract, it is the duty of the court to construe any statute under which that power is claimed. I cannot, however, in the present state of the record, determine whether the rights of the United States Telegraph Company had been legally transferred to the complainant. That question can only be decided upon consideration of the assignment or conveyances under which the transfer was made, and of the laws authorizing such instruments to be executed, and these are not before me. I can only determine, so far as I am concerned, the question whether the railway company could, under the act above quoted, have entered into a contract like the one in controversy with the said United States Telegraph Company. By the law as it stood before the passage of the act of 1864, which is now to be construed, the Kansas Pacific Railroad Company, Eastern Division, was bound to construct a telegraph line of its own. The act of 1864 allowed it to relieve itself of that duty and to devolve it upon the United

States Telegraph Company.    An arrangement was authorized between the railway and telegraph companies "so that the line of telegraph between the Missouri river and San Francisco may be made upon and along the line of said railroad and branches as fast as said road and branches are built."    Made by whom?    Evidently not by the railway company, for it was already authorized to erect a line of telegraph, and no arrangement was necessary for that purpose. It was, then, to be an arrangement by which the United States Telegraph Company should erect the telegraph line. It would seem that the transfer of an existing line over part or all of the route was also contemplated, for it is further provided in the same sentence as follows:    "And if said arrangement be entered into, and the transfer of said telegraph line be made in accordance therewith to the line of said railroad and branches, such transfer shall, for all purposes of the act referred to be held and considered, a fulfilment on the part of said railroad companies of the provisions of the act in regard to the construction of a telegraph line."    I think it plain that under this act it would have been competent for the Kansas Pacific Railroad Company, Eastern Division, to have made an arangement with the United States Telegraph Company whereby the latter could have erected a line of telegraph upon the line of the railroad, using for that purpose, in part or in whole, the poles and wires used by it upon its then existing line.    The same policy had been previously adopted by congress, (see section 19 of the original Pacific Railroad charter.)    It is, however, contended that the act of 1864, and said section 19 of the original charter, only related to the *erection* of the telegraph line, and did not authorize the railway companies to devolve the duty of operating such lines, after erection, upon the telegraph companies named.

This suggestion has received careful consideration, and my conclusion is that the act authorized something more than the employment of this particular telegraph company to construct the line.    No legislation was necessary for that purpose.    Congress evidently intended to protect the interest of telegraph companies that had, at great cost, erected telegraphs

upon lines west of the Missouri river, and which were in
danger of being rendered worthless by the lines about to be
constructed by the railroad companies. It did not provide
for a sale by the telegraph company to the railroad company
of the material of the then existing lines, nor did it provide
for a sale of the franchises of the telegraph company. It
clearly provided for an arrangement by which the telegraph
company might transfer its line *and business* to the line of the
railroad. This is made more evident by the further provis-
ion that, in case of disagreement, the telegraph company
may transfer its line of telegraph upon and along the line of
the railroad without prejudice to the rights of the railroad
company. The purpose of the act is here made manifest. It
was to authorize the transfer of the telegraph line of the United
States Telegraph Company to and along the line of the rail-
road, and permit its operation there, upon such terms as
might be mutually satisfactory; or, if no terms could be
agreed upon, then as a matter of right in the telegraph com-
pany. It was, of course, not the purpose of congress to
authorize the telegraph company to establish and construct
its line of telegraph along the line of the railroad without
the right to operate the same after it was so established and
constructed.

I am, therefore, clearly of the opinion that the fourth sec-
tion of the act of July 2, 1864, above quoted, authorized the
Kansas Pacific Railway Company, Eastern Division, to enter
into a contract with the United States Telegraph Company
embodying the terms of the contract set forth in the bill,
with the exception of the clause respecting the family, private
and social messages of the executive officers of the railroad
company, which will now be considered.

5. The contract in question provides as follows: *"Fourth,*
the business of said railway, including its construction, lands,
and all business of the company, and the family, private and
social messages of the executive officers, shall be transmitted
without charge between all telegraph stations on the line of
said railway, and also between all such stations and the city
of St. Louis, Missouri, and over all other lines in Missouri,

Kansas, Colorado and New Mexico now owned or controlled, or that may hereafter be owned or controlled, by the Western Union Telegraph Company: *provided,* as far as said lines in Colorado or New Mexico are concerned, the said road or roads of the Union Pacific Railway Company, Eastern Division, shall at the time be in process of construction towards Santa Fe, or Denver, or both; and all such business shall be transmitted free of charge over all other lines owned or controlled, or that may hereafter be owned or controlled, by the said telegraph company, within the United States, to an amount not exceeding the rate of $4,000 per annum, and for any excess above such rate the telegraph company will deduct and abate one-half the regular tariff charges— settlements and payments for such excess to be made yearly."

That this provision of the contract is against public policy and therefore void, is, to my mind, entirely clear. It amounts to an agreement to give to each of the officers of the company who made the contract, and to each of their successors who should maintain it, a valuable consideration for his official action in that behalf; a consideration of a private and personal character, enuring to the officers' private benefit and gain, and not to the benefit of the company or other stockholders. It is said, however, that this feature of the contract may be eliminated, and that the remainder may stand and be enforced. It is true that the policy of the law is to effectuate rather than defeat a contract, and to this end parts or provisions which are comparatively unimportant, and which may be severed from the contract without impairing its effect or changing its character, will sometimes be suppressed. 2 Parsons, Con. 505.

But the clause above quoted cannot be set aside as unimportant. It constituted, to say the least, one of the considerations on which the contract was made, and it is well settled that "if the contract be made on several considerations, one of which is illegal, the whole contract is void, and that whether the illegality be at common law or by statute." Chitty on Contracts, (8th Am. Ed.) 572. An agreement to give to an

officer of a corporation anything of value, in consideration for his assent to the execution of a particular contract, is, without doubt, an immoral and unlawful agreement, and one which equity will not enforce; and a careful examination of the subject leads me to the conclusion that no affirmative relief can be granted upon a contract which includes this as one of its features, although it be in other respects unobjectionable. There is, of course, no merit in the defence here, so far as the railway company is concerned, for both officers and stockholders were undoubtedly aware of the existence of the contract, and have for over 13 years acquiesced in it and enjoyed its advantages. It is for the protection of public interests that courts take notice of the immorality of such contracts whenever, by any means, made aware of it. In the present case the court cannot ignore this objectionable feature of the contract, since it is set out in full by the complainant in the body of the bill, and all its provisions are brought to the attention of the court by the demurrer. The contract being tainted with immorality, the law is well settled that a court of equity must leave the parties to it where it finds them, without affirmative relief, and this whether the contract has been executed or not. *Marshall* v. *R. Co.* 16 How. 314; *Bank U. S.* v. *Owens,* 2 Pet. 539; 2 Redfield on Railways, 576, 584; Pomeroy on Specific Performance, §§ 284–6; *Wright* v. *Rindskoph,* 43 Wis. 344; *McWilliams* v. *Phillips,* 57 Miss. 196; *Guernsey* v. *Cook,* 120 Mass. 501; *Setter* v. *Avery,* 15 Kan. 157.

A contract may be *ultra vires,* and yet, if it is not immoral, it may, after it has been executed, in whole or part, form the basis for equitable relief. If, therefore, it was conceded that this contract was beyond the powers of the railway company, it would still, but for the clause now under consideration, be proper to hold the parties bound by their executed dealings under it. Such was my opinion in the case of *The Telegraph Co.* v. *The Railway Co., supra,* and to that opinion I still adhere. But when a party comes into a court of equity and asks affirmative relief upon a contract which, in one of its

provisions, is upon its face, immoral and corrupt, the court can only say to the complainant, in the language of the supreme court in *Creath* v. *Sims*: "However unworthy may have been the conduct of your opponent, you are confessedly *in pari delicto*; you cannot be admitted here to plead your own demerits. Precisely, therefore, in the position in which you have placed yourself, in that position we must leave you." 5 How. 204.

The officers of a railway company are *quasi* public officers. Their duties are of a fiduciary character. They are, in an important sense, trustees. To pay them individually anything of value for executing a corporate contract is grossly unlawful, and taints such contract with moral turpitude. Vast interests, in which the public, as well as the immediate parties, are deeply concerned, are entrusted to the control and management of such officials; and, in my judgment, there are important considerations of public policy which demand that courts of justice shall hold them to a strict account, and shall never for a moment recognize as valid a contract obtained by paying directly or indirectly to such officials any consideration, whether large or small.

The demurrer to the bill is sustained.

Complainants may have leave to amend, if desired; otherwise there will be a decree dismissing the bill. And unless it can be made to appear by an amended bill that complainant has at least a probable right to retain possession of the telegraph lines and property independently of the contract, the injunction must be dissolved.

FOSTER, D. J. I concur in the conclusion reached by the circuit judge that the demurrer to the bill should be sustained, but am not prepared to express an opinion on the construction of section 4, act of July 2, 1864, or the powers conferred on the defendant company by that act. My judgment only extends to what appears in the bill. And under the provisions of the Pacific Railroad act of 1862, and the powers and duties conferred and imposed thereby, I am of the opinion that this contract is *ultra vires* the defendant company and

therefore void. Am further of the opinion that the provision in the contract for transmitting the private, social and family messages of the executive officers of the railroad company vitiates the contract and renders it illegal.