HOFFMAN v. McMULLEN.

(Circuit Court of Appeals, Ninth Circuit. October 4, 1897.)

No. 334.

1. CONTRACTS AGAINST PUBLIC POLICY—BIDS FOR PUBLIC WORK.
    Agreements which, in their operation upon the action of the parties, tend to restrain their natural rivalry and competition in bidding for public work, are against public policy, and void.

2. SAME.
    A mere honest and open co-operation between two or more persons to accomplish an object which neither could gain if acting alone is not within the rule against combinations to stifle competition.

3. SAME—SUITS INVOLVING ILLEGAL TRANSACTIONS.
    Wherever a party seeking to recover money connected with illegal transactions is obliged to make out his case by showing the illegal contract or transaction, or through its medium, or when it appears that he was privy to it, then he must fail; but when his title or right, though remotely connected with that contract or transaction, is not dependent upon it, and he can prove his case without reference to it, then he may recover.

4. SAME—SHARING PROFITS OF ILLEGAL CONTRACT.
    Where parties combine to stifle competition in bidding on certain public works, and the contract is thereupon secured by one of them, a further agreement between them to share the losses and profits under it is tainted with illegality, and is unenforceable.

**5. SAME—BIDS FOR PUBLIC WORK.**

The validity of an agreement between rivals for public work does not depend on whether the public is actually injured, but on the purpose of the parties.

**6. SAME—INVESTING PROCEEDS OF ILLEGAL CONTRACT.**

It seems that, if parties to an illegal and unenforceable agreement continue their partnership by investing the proceeds in property, neither of them could set up, as against the other, that the money thus invested was derived as profits from an illegal transaction in which the rights of the public were involved.

**7. SAME—ACCOUNT STATED.**

It seems that if one of the parties to an illegal and unenforceable contract, who has received profits under it, admits that a specified sum is due to the other party, the latter might maintain an action upon an account stated between them.

Appeal from the Circuit Court of the United States for the District of Oregon.

Dolph, Mallory & Simon, for appellant.

Cox, Cotton, Teal & Minor and R. Percy Wright, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is a suit in equity brought by John McMullen (plaintiff) against Lee Hoffman (defendant) for an accounting of the profits earned on a contract to construct a pipe line by which the city of Portland is supplied with water. Pending the suit, Lee Hoffman died, and the suit was revived against Julia E. Hoffman, executrix of the last will and testament of Lee Hoffman, deceased. The water committee representing the city of Portland having advertised for bids to construct the line, the original parties hereto entered into an agreement by which the defendant, Hoffman, bid for the work, in the name of Hoffman & Bates. The plaintiff, McMullen, with the knowledge and concurrence of the defendant, made a separate bid in the name of the San Francisco Bridge Company, a company controlled by him. This bid was some $49,000 higher than the bid of the defendant. The contract having been awarded to the defendant, a written agreement of partnership was entered into by the parties for the execution of the contract to be entered into by the defendant with the city, which agreement reads as follows:

"This agreement, made and entered into by and between Lee Hoffman, of Portland, Oregon, doing business under the name of Hoffman & Bates, party of the first part, and John McMullen, of San Francisco, California, party of the second part, witnesseth: That whereas, said Hoffman and Bates have, with the assistance of said McMullen, at a recent bidding on the work of manufacturing and laying steel pipe from Mount Tabor to the head works of the Bull Run water system for Portland, submitted the lowest bid for said work, and expects to enter into a contract with the water committee of the city of Portland for doing such work, the contract having been awarded to said Hoffman and Bates on said bid: It is now hereby agreed that said Hoffman and said McMullen shall and will share in said contract equally, each to furnish and pay one-half of the expenses of executing the same, and each to receive one-half of the profits, or bear and pay one-half of the losses, which shall result therefrom. And it is further hereby agreed that, if either of the parties hereto shall get a contract for doing or to do any other part of the work let or to be let by said committee for bringing Bull Run water to Portland, the profits and

losses thereof shall in the same manner be shared and borne by said parties equally, share and share alike."

The contract awarded on defendant's bid was formally entered into by the water committee, of the one part, and by the defendant, in the name of Hoffman & Bates, of the other. The contract proved a profitable one, the profits thereunder amounting to nearly $140,000. Hoffman refused to account to McMullen for any part of these profits, upon the ground that the bids made by them tended, under the circumstances, to lessen competition, and operated as a fraud upon the city, and could not be enforced in equity, and upon the further ground that McMullen wholly failed to comply with the contract between the parties, and refused to perform the conditions upon which the defendant's agreement, to share the earnings of the contract with the plaintiff, was made.

The whole transaction grows out of the enterprise undertaken by the city of Portland to conduct the water of Bull Run river some 30 miles, to the city. The water was to be conveyed through steel pipes, and had to be conducted across streams which required the construction of bridges, and expensive and permanent works had to be erected at Bull Run river, where the water was diverted from the river to the pipe. The construction of this work was placed by the legislature in the hands of a committee composed of 15 persons, who managed the business for the city. This committee decided to let this work at a public letting to the lowest bidder, and to that end the work was divided into the following general classes: (1) Head works; (2) bridges; (3) wrought-iron plates; (4) steel conduit of head works to Mt. Tabor; (5) manufacturing and laying wrought-iron or steel pipes from head works to Mt. Tabor; (6) steel plates for pipe; (7) conduit from head works to Mt. Tabor, cast iron; (8) cast-iron pipe for Mt. Tabor City Park; (9) submerged pipes,—and separate bids invited for each. The letting was the ordinary public letting upon sealed proposals. Hoffman and McMullen each undertook to secure contracts to do this work, or some portion of it, by bidding for it, in response to the invitation of the water committee. Bids for each of the following items were accordingly submitted by them to the water committee, Hoffman bidding in the name of Hoffman & Bates, and McMullen bidding in the name of the San Francisco Bridge Company: Head works: Hoffman & Bates, $17,800; San Francisco Bridge Company, $16,550. Bridges: Hoffman & Bates, $33,562.94; San Francisco Bridge Company, $31,279.07. Steel conduit from head works to Mt. Tabor: Hoffman & Bates, $359,278; San Francisco Bridge Company, $348,781. Conduit from head works to Mt. Tabor, of steel or wrought iron, making and laying pipe: Hoffman & Bates, $465,722; San Francisco Bridge Company, $514,664. McMullen submitted a bid in the name of the San Francisco Bridge Company for the submerged pipe of $97,340. For this work Hoffman did not bid. They agreed in advance upon what parts of the work they should bid, upon what their respective bids should be, and upon what portion the bid of the San Francisco Bridge Company should be cheapest. There was also an understanding between them, as to some portions of the work, that the lowest bid should be withdrawn in the event that there

were no other outside bids lower than those of Hoffman & Bates. In other words, they were to pool their bids, and so arrange matters that the highest bid, as between themselves, should, if possible, be accepted, and they would divide the proceeds of the contract. Suggestions were freely made as to the propriety of taking in other bidders, and also the secretary of the committee, so that honest bids might be withheld, and others ascertained, by fraudulent and improper means. The following extract from a letter written by McMullen to Hoffman fairly illustrates the means they proposed to use to accomplish the object they had in view:

"I do not want to let go on that submerged pipe; want to get the job. I think we can make $25,000 on that job, but we must pool it. To do this, we will have to let the secretary, Frank T. Dodge, in, and, if any bids come without personal representatives, have him not receive them until after the letting, and then return them unopened; and we will gather in everybody that is personally represented. Don't think there is many."

The circuit court, upon final hearing, rendered a decree in favor of McMullen for $52,241.18, and one-half of the assets, consisting of plant and tools, furniture, and camp fixtures, of the cost value of $7,857.36, and a disallowed claim against the city of Portland for $16,961.25. From this decree Hoffman appeals. There is also a cross appeal taken by McMullen from the decree of the court allowing Hoffman a salary of $1,000 per month, and from the refusal of the court to allow him interest on the money found due, and refusal to allow him costs. The appeal of Hoffman will first be considered.

The contention of appellant is that the manner in which the parties hereto presented their bids, and sought thereby to procure contracts from the committee, was illegal. It is not seriously denied but what the city of Portland could have successfully defended any action that might have been brought against it by the contractors, Hoffman & Bates, upon the ground that the contract was secured by illegal means. It did not do so. It paid the money to Hoffman. The question here presented is: Can the defendant avail himself of this defense? The authorities answer this question in the affirmative. It is true that the objection that a contract was immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. But it is not for his sake that the objection is ever allowed. The refusal of courts to enforce such contracts is always founded in general principles of public policy, which the defendant may take the advantage of, contrary to the real justice of the case, as between the parties plaintiff and defendant. It is the duty of all courts to keep their eye steadily upon the interests of the public, and when they find an action is founded upon a claim injurious to the public, and which has a bad tendency, to give no countenance or assistance to it in foro civili.

In dealing with illegal contracts, courts do not and cannot look alone to those who are parties to the illegal transaction. The law regards the welfare of society as paramount, and, in enforcing the law, courts will not impair its efficacy or cripple its operations by considerations affecting the interests of those who are participes criminis. The principle of public policy is this: "Ex dolo malo non oritur actio." No court will lend its aid to a man who founds his cause of

action upon immoral or illegal acts. If, from the plaintiff's own showing or otherwise, the cause of action appears to arise ex turpi causa, or out of the transgression of a positive law of the country, then the court says he has no right to be assisted. It is upon that ground that the court goes; not for the sake of the defendant, but because it will not lend its aid to such a plaintiff. So, if the plaintiff and defendant were to change sides, and the defendant was bringing his action against the plaintiff, the latter would have the advantage of it; for, where both are equally at fault, potior est conditio defendentis. Bartle v. Coleman, 4 Pet. 184, 189; Tool Co. v. Norris, 2 Wall. 45, 54; McCausland v. Ralston, 12 Nev. 195, 206, et seq., and authorities there cited; Western Union Tel. Co. v. Union Pac. Ry. Co., 1 McCrary, 418, 427, 3 Fed. 1; Buck v. Albee, 26 Vt. 184; Hannah v. Fife, 27 Mich. 172, 181; Wooden v. Shotwell, 23 N. J. Law, 465; Price v. Polluck, 37 N. J. Law, 44; Belding v. Pitken, 2 Caines, 147; Leonard v. Poole, 114 N. Y. 271, 379, 21 N. E. 707; Hope v. Association (N. J. Err. & App.) 34 Atl. 1070.

In Bartle v. Coleman the court said:

"The law leaves the parties to such a contract as it found them. If either has sustained a loss by the bad faith of a particeps criminis, it is but a just infliction for premeditated and deeply practiced fraud, which, when detected, deprives him of anticipated profits, or subjects him to unexpected losses. He must not expect that a judicial tribunal will degrade itself by an exertion of its powers, by shifting the loss from the one to the other, or to equalize the benefits or burdens which may have resulted by the violation of every principle of morals and of laws."

A contract to prevent competition and bidding for public work is contrary to public policy, and cannot be enforced. The rule is universal that agreements which, in their necessary operation upon the action of the parties, tend to restrain their natural rivalry and competition, and thus to result in the disadvantage of the public or third parties, are against the principle of sound public policy, and are void. Gulick v. Ward, 10 N. J. Law, 87, 91; Swan v. Chorpenning, 20 Cal. 182, 185; Hannah v. Fife, 27 Mich. 172, 180; Weld v. Lancaster, 56 Me. 453, 457; Noyes v. Day, 14 Vt. 384; Gibbs v. Smith, 115 Mass. 592; Doolin v. Ward, 6 Johns. 194; Wilbur v. How, 8 Johns. 444; Thompson v. Davies, 13 Johns. 112; Kelly v. Devlin, 58 How. Prac. 487; Atcheson v. Mallon, 43 N. Y. 147; Hunter v. Pfeiffer, 108 Ind. 197, 200, 9 N. E. 124; King v. Winants, 71 N. C. 469, 474; Durfee v. Moran, 57 Mo. 374, 379; Lawnin v. Bradley, 13 Mo. App. 361; Engelman v. Skrainka, 14 Mo. App. 438; Woodruff v. Berry, 40 Ark. 252, 267; Hyer v. Traction Co., 80 Fed. 839, 844. Do the facts and circumstances of this case bring it within this general rule? Can this case, consistently with the reasoning of the authorities, be excepted from it? Does it infringe in any manner upon any principle of public policy? It is argued by appellee that the bidding was not illegal, because the proof shows that McMullen and Hoffman were jointly interested in the bid, and that the law allows two or more persons to combine together for the purpose of making one bid. This is true where no fraudulent purpose is involved. An honest co-operation between two or more persons to accomplish an object which neither could gain if acting alone in his individual capacity is not within the rule, al-

though, in a certain sense and to a limited degree, such co-operation might have a tendency to lessen competition. There may be a competition that saves as well as a competition that kills. The amount of work to be performed, the necessity of obtaining means to properly carry on the contract, the responsibility of the parties, their ability to complete the work, etc., are matters which are liable to make it absolutely necessary for rival contractors to combine their forces and unite together, not only in order to secure the contract, but to enable them, if it is obtained, to complete it without financial embarrassments or other difficulties which are liable to arise in cases of individual responsibility. There is no valid objection to such voluntary combinations if the joint action of the parties is done honestly and in good faith. In all contracts secured in such a manner the courts should never hesitate to protect parties in their agreements with each other, and compel them to comply with the terms thereof. It is only where the facts and circumstances surrounding the case clearly show that illegal means or improper and deceptive influences and methods were used to procure the contract that the maxim, "in pari delicto," applies.

In Atcheson v. Mallon, 43 N. Y. 147, 151, the court said:

"A joint proposal, the result of honest co-operation, though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. Joint adventures are allowed. They are public and avowed, and not secret. The risk as well as the profit is joint and openly assumed. The public may obtain, at least, the benefit of the joint responsibility, and of the joint ability to do the service. The public agents know, then, all that there is in the transaction, and can more justly estimate the motives of the bidders, and weigh the merits of the bid."

In Gibbs v. Smith, 115 Mass. 592, the court, in drawing the line of distinction in an analogous case, said:

"An agreement between two or more persons that one shall bid for the benefit of all upon property about to be sold at public auction, which they desire to purchase together, either because they propose to hold it together, or afterwards to divide it into such parts as they wish individually to hold, neither desiring the whole, or for any similar honest or reasonable purpose, is legal in its character, and will be enforced; but such agreement, if made for the purpose of preventing competition and reducing the price of the property to be sold below its fair value, is against public policy, and in fraud of the just rights of the parties offering it, and therefore illegal."

See, also, Lawnin v. Bradley, supra; Cocks v. Izard, 7 Wall. 559.

The fraud, if any, in the present case, was in withholding the truth, —in fraudulently representing and holding themselves out to the committee and to the public as rival bidders, when in fact they were not. The learned judge who tried this case, in his opinion upon the exceptions to the defendant's answer, said:

"When the parties presented themselves as competitors for the work, they were guilty of a fraud. The tendency of what was thus done was to cause the water committee to believe that the bid of defendant was a favorable one for the city. Moreover, plaintiff's pretended bid had the effect of a representation to the committee that, in plaintiff's opinion, the work could not be profitably done for less than a figure $35,000 higher than that bid by defendant, although, as a matter of fact, plaintiff believed such work could be done, and, except for the collusive agreement with defendant, would have offered to do it, for an amount $75,000 less than that at which the contract was let. Upon all the cases cited or to be found, and in any view of the case consistent with

public policy and the principles of equity, there can be no relief in such a case." McMullen v. Hoffman, 69 Fed. 509, 518.

Upon the final hearing, he came to the conclusion that his former opinion was erroneous, and held that the contract and agreement of the parties were valid as between themselves. McMullen v. Hoffman, 75 Fed. 547.

This case, in principle, cannot, in our opinion, be distinguished from Atcheson v. Mallon, supra, although the facts here as to the illegal character of the transaction are much stronger than in that case. There the parties simply showed each other their bids, and agreed to divide the profits. Mallon was the lowest bidder, and obtained the contract. The money due on the contract when completed was paid to him. The profits amounted to $400. Mallon refused to divide. Atcheson brought suit to recover his share of the profits. The court refused to enforce the contract. After announcing the general rule which we have stated, and declaring the general principles applicable thereto, the court said:

"If Mallon had promised Atcheson a sum of money if he would refrain from making any proposal, and Atcheson, relying upon it, had made none, and then had sought to enforce the agreement, there can be no doubt that the law would have held the promise void. And why? Not out of any consideration for the parties to it, but because its effect was to remove Atcheson from the number of earnest bidders, and thus, by lessening competition, to detriment of the public. And the agreement which was made, laying open to Mallon just what was the judgment of Atcheson of a profitable bid, and removing, in effect, an interested rival, tended to affect Mallon's action; while Atcheson, confident that, if Mallon succeeded, it was also his own success, lost the impulse to a real competition with him. It seems beyond cavil that the agreement is obnoxious to the rule above stated, and such agreements courts refuse to enforce."

Nor can this case be distinguished in principle from Swan v. Chorpenning, supra. In that case both parties to the agreement were mail contractors. Swan put in a bid for carrying the mail over a certain route, and agreed with C. to withdraw his bid, and use his influence to induce the government to give to C. a contract for a longer route, including the one bid upon, on consideration that, if C. obtained the contract, S. should have an interest in it, or be paid an equivalent pecuniary compensation. Chorpenning obtained the contract, and, after payment to him, refused to divide the profits. The court, after quoting Gulick v. Ward, said:

"We see no difference in principle between the question in that case and the one now presented, and the cases clearly fall within the same category. In respect to the consideration, it is impossible to distinguish them; for an agreement not to bid and an agreement to withdraw a bid already put in are certainly obnoxious to the same legal objections."

Now, the agreement in the present case was substantially to the same effect. In consideration of sharing in the profits, McMullen did not put in an honest bid. He put in a bid much higher than he would otherwise have done but for the agreement. His object, evidently, was to deceive the committee,—to convey the idea that he was a rival bidder, when in fact he was not. Such conduct certainly tended to destroy competition, and to preclude the advantages which inevitably resulted from it. Equally strong in its similarity as to

the effect of the agreement between the bidders is the case of Hannah v. Fife. That was an action brought by Fife and Haviland against the plaintiff in error, as the sureties of one Oscar L. Noble in a contract between said Noble and Fife and Haviland, by which Noble agreed to enter into and perform a contract with the state for the construction of a swamp land state road, for the building of which said Fife and Haviland had been the lowest bidders, and to give them, as a bonus for being allowed to take their place in the contract, eight sections of swamp lands to be received from the state for the performance of the work. Noble's bid, in the first instance, was in reality less than the bid of Fife and Haviland, but it was not made out in accordance with the plan submitted by the state, and could not be accepted. The bidders obtained a continuance, and, before the bid was let, the agreement in question was made, and Noble got the contract. The court, in the discussion of the case, said:

"Now, if these bidders, Noble, on one side, and Fife and Haviland, on the other, had, before or at the time of making their respective bids, entered into a secret agreement, for their mutual profit and to avoid competition with each other, that, for the purpose of getting a contract from the state for building this road at the highest rate or greatest quantity of land allowed by the law, only one of the parties should put in a bid, which in its terms would accord with the plan of the road adopted by the state, and with the notice given, while the other, though not in accordance with that plan or notice, should in all other respects appear to be in accordance with the terms proposed by the state, and better in some respects than the bid of the other, but which, nevertheless, could not be accepted, because not in accordance with the plan (thus securing in advance the letting of the contract to one of the parties * * * without danger of competition from the other, while keeping up the appearance of competition); and that the contract should be performed by one of the parties for the mutual profit of both; or that the party taking the contract and doing the work should give to the other, as his share of profit, eight sections or any other portion of the land to be received from the state,—if such had been the previous arrangement between the parties, it will not be pretended that such an understanding, or any agreement resting upon it or calculated to carry it into effect, could have been sustained. It would have been so manifestly fraudulent, as against the state, and so subversive of the intentions and objects of the legislation, that no court could hesitate for a moment to declare it illegal and void."

There was no evidence in that case except such as could be legally drawn from the facts that there was any such previous agreement. But the court said it was difficult to resist the conclusion that the facts as proved tended "pretty strongly to show the existence of some such previous understanding," and that the putting in the bid "by Noble in a mode which, under the notice, could not have been accepted, is not, when considered with reference to the subsequent acts of the parties, easily explained upon any other rational theory than that of previous concert for the purpose already intimated." The court further said:

"But whether there was, in fact, any such secret understanding or fraudulent collusion between the bidders or not, is, in my opinion, entirely immaterial to the decision in the present case. It seems to me clear that the tendency of all such contracts between bidders as that here in question, if recognized as valid by the courts, must be to afford encouragement and give facilities to bidders to enter into and give full effect to such secret agreements and combinations, and to enable them to defeat the plain intent and object of the legislature in requiring such contracts to be let to the lowest responsible bidder."

In the present case it is evident that McMullen and Hoffman understood each other; that their intention was to prevent open competition, which the law encourages. In their confederacy they were aiming at the same result,—that of compelling the city to pay a higher price for the work than McMullen believed it was worth.

Breslin v. Brown, 24 Ohio St. 565, 570, is perhaps the strongest case presented in favor of appellee herein as to the right of parties who had intended to bid, and did bid, upon public improvements that were to be let to the lowest bidder, to enter into an agreement to become partners in the work in the event that the contract should be awarded to either, and that the contract, when awarded, should inure to the benefit of the firm. But that case, in its facts, is clearly distinguishable from the case at bar in many of its essential particulars. There senarate and independent bids were filed by the respective parties. "The bid of each was based upon his own judgment and filed at his own discretion." It did not appear that either had knowledge of the other's bid, and these facts led the court to the conclusion that the agreement made between the parties, and the result of the bidding, did not have a tendency to stifle competition at the letting of the bid. Here the parties agreed in advance as to what their bids were to be. Each knew what the bid of the other was. The intent, object, and tendency of their co-operation in the contract, as is fully and clearly shown by the testimony, was to deceive the committee, and commit a fraud upon the public.

In Hunter v. Pfeiffer the appellant and the appellee were about to bid for the construction of a public work, but the appellant was induced to withhold his bid in consideration that he should be taken into partnership, and be permitted to share in the profits of any contract which appellee might secure. The court said:

"Upon all such partnerships the law sets the seal of its condemnation. Persons who combine in schemes of the character disclosed can secure no aid from the courts in coercing a division of the profits anticipated or accrued. * * * If the court should lend any countenance to such a contract of partnership as that disclosed in the complaint, in either aspect in which it is presented, the effect would be to afford facilities for bidders to enter into secret agreements and combinations with each other, and thus enable them to defeat the plain purpose of the legislature in requiring such contracts to be let to the lowest and best bidder."

At the close of the opinion the court said:

"If, in letting a contract such as this, parties, without knowledge of the bids of each other, submit their bids as the law requires, and afterwards enter into a partnership for the construction of the work with the knowledge of the officers letting the same, a question of a different character is presented. Such a transaction bears some similitude to the contract which was upheld in Breslin v. Brown, 24 Ohio St. 565, a case which, on account of the liberal view taken of the contract there involved, is not universally indorsed. That case, however, affords no aid to the appellant here."

The cases are too numerous to be specifically reviewed. The dividing line is always sharply drawn with reference to the particular facts of each case, and the conclusion reached that where the parties have acted openly and honestly, and entered into an agreement which neither in its purpose, effect, nor natural tendency is to prevent a fair competition, it can be and should be enforced. But, where there is a

secret combination,—call it partnership or any other name,—the effect of which is, or the natural tendency of which is, to abate honest rivalry or prevent fair competition, it is to be and is condemned, as violative of public policy, and held to be absolutely void. All the authorities hold that, where either the intention, the effect, or the necessary tendency of the combination is to stifle or limit competition, it is contrary to public policy, and, when discovered, will be stamped with marks of disapproval in any court of law or of equity. Were any of the subsequent acts of the parties, or the condition of the contract as to its completion, or any other fact or circumstance established at the trial, of such a character as to take this case out of or away from the general rule hereinbefore stated in relation to illegal contracts?

It is claimed that, before the money was paid by the city, it had knowledge of the true relations existing between McMullen and Hoffman, and, with such knowledge, accepted the work, and paid the contract price therefor, and that the city was not in any manner injured by the illegal acts of the plaintiff and defendant herein. But the law is well settled that the question of the validity of the contract does not depend upon the circumstance whether the public has, in fact, suffered any detriment, but whether the contract is in its nature such as might have been injurious to the public. That which renders the contract illegal is not the injury the parties have actually occasioned, but the purpose they must have contemplated when it was made. Its validity is tested, not by its results, but by its objects, as shown by its terms. In addition to the authorities heretofore cited, see Gibbs v. Smith, 115 Mass. 592; Atcheson v. Mallon, 43 N. Y. 147, 149; Woodworth v. Bennett, 43 N. Y. 273, 278; Weld v. Lancaster, 56 Me. 453, 457; Richardson v. Crandall, 48 N. Y. 348, 362. It is not therefore necessary, in the determination of this case, to inquire whether the effect of the agreement between the parties was in fact detrimental or beneficial to the city of Portland.

Appellee argues that the case as presented comes within the rule, so frequently announced in the authorities, that a contract or an agreement will be enforced, even if it is incidentally or indirectly connected with an illegal transaction, provided it is supported by an independent consideration, so that the plaintiff will not require the aid of the illegal transaction to make out his case. This principle is undisputed. Armstrong v. Bank, 133 U. S. 434, 469, 10 Sup. Ct. 450, and authorities there cited. See, also, Woodworth v. Bennett, 43 N. Y. 273; Buck v. Albee, 26 Vt. 184; Gilliam v. Brown, 43 Miss. 642, 660; Western Union Tel. Co. v. Union Pac. Ry. Co., 1 McCrary, 558, 562, 3 Fed. 423; Swan v. Scott, 11 Serg. & R. 155; Wright v. Pipe Line Co., 101 Pa. St. 204, 208. This argument, with the authorities cited in its support, will be considered in connection with the further contention of appellee that the case, upon its facts, comes within the general principle that, after the illegal contract has been fully executed, one party, in possession of all the gains and profits resulting from the illicit traffic and transaction, will not be tolerated to interpose the objection that the business which produced the fund was in violation of law. McBlair v. Gibbes, 17 How. 232, 237; Railroad Co. v. Durant, 95 U. S. 576, 578; Sharp v. Taylor, 22 Eng. Ch. 801,

817; Gilliam v. Brown, 43 Miss. 642, 664; Lestapies v. Ingraham, 5 Pa. St. 71, 81; Hipple v. Rice, 28 Pa. St. 406; Willson v. Owen, 30 Mich. 474; Richardson v. Welch, 47 Mich. 309, 11 N. W. 172; Wann v. Kelly, 2 McCrary, 628, 630, 5 Fed. 584; Tenant v. Elliott, 1 Bos. & P. 3; Farmer v. Russel, Id. 296; Thomson v. Thomson, 7 Ves. 470; Owen v. Davis, 1 Bailey, 315. There are certain underlying principles—clear and well defined—which govern and control the propositions announced in these authorities; and, from a careful consideration thereof, it can readily be ascertained whether they have or have not any binding force in their application to the facts of this case.

Armstrong v. Bank, supra, which was a suit upon a draft and certificate of deposit, may be taken as a representative case under the first proposition. Armstrong was the receiver of the Fidelity National Bank of Cincinnati, Ohio. The facts were that on June 14, 1887, the Fidelity National Bank of Cincinnati drew a draft for $100,000 on the Chemical National Bank of New York City, payable to the order of the American Exchange National Bank of Chicago, and put it into the hands of one W., who delivered it, for value, to K. & Co. They indorsed it for deposit to their account to the Chicago bank, which credited the amount to them, and paid their checks against it. The court held that W. did not act as the agent of the Cincinnati bank, and that in a suit by the Chicago bank against the receiver of the Cincinnati bank, which had failed, to recover the amount of the draft, the Chicago bank was a bona fide holder of it for value, and want of consideration could not be shown by the receiver. One defense set up to the suit on the certificate of deposit was that H. (the vice president of the Cincinnati bank), its assistant cashier, and W., of W. & Co., conspired to defraud that bank by using its funds in speculating in wheat in Chicago, through K. & Co., so as to make a "corner" in wheat. The court held that the plaintiff could not refuse to honor the checks of K. & Co. against the deposit, on the ground that K. & Co. intended to use the money to pay antecedent losses in the gambling wheat transactions; that, where losses have been made in an illegal transaction, a person who lends money to the loser with which to pay the debt can recover the loan, notwithstanding his knowledge of the fact that the money was to be so used. It was these facts, and rulings of the court, that led up to the announcement of the legal principles under consideration. In the discussion of that case the court said:

"When the plaintiff received the deposit from Kershaw & Co., it was bound to honor their checks against it; and it could not refuse to pay them on the ground that Kershaw & Co. intended to make an improper use of the money. If Wilshire, Eckert & Co. and Kershaw & Co. were engaged in gambling, and the former had deposited money in the Fidelity Bank to be transferred to the plaintiff, in order that Kershaw & Co. might check out the amount from the plaintiff's bank in payment of losses sustained in the gambling transactions, and both banks knew that the money was to be so used, still the Fidelity Bank, having received the deposit, could not refuse to pay it over to the plaintiff, and the plaintiff, having received it, could not refuse to honor the checks of Kershaw & Co. drawn against it."

The Armstrong Case is in line with the early English cases of Tenant v. Elliott, Farmer v. Russel, Sharp v. Taylor, and others

heretofore cited, to the effect that A., having received money to the use of B. on an illegal contract between B. and C., shall not be allowed to set up the illegality of the contract as a defense in an action brought by B. for money had and received. The principle of these cases cannot be questioned. But a bare statement of the facts upon which the principles were there applied shows, beyond question, that the facts of the present case are not, and cannot be brought, within the rule there announced. This case belongs to a different class. The distinction between the class of cases is clearly set forth in Thomson v. Thomson, supra. The master of the rolls, after declaring that the agreement there under consideration was illegal, said:

"There is an equity against the fund, I admit, if you can get at it by a legal agreement. The defense is very dishonest, but in all illegal contracts it is against good faith as between the individuals to take advantage of that. A man procures smuggled goods, and keeps them, but refuses to pay for them. So, in the underwriter's case, an insurance contrary to the act of parliament, the brokers had received the money, and refused to pay it over: and it could not be recovered. No matter who complains of it, the thing is illegal. You have no claim to this money except through the medium of an illegal agreement, which, according to the determinations, you cannot support. I should have no difficulty in following the fund, provided you could recover against the party himself. If the case could have been brought to this, that the company had paid this into the hands of a third person for the use of the plaintiff, he might have recovered from that third person, who could not have set up this objection as a reason for not performing his trust. Tenant v. Elliott is, I think, an authority for that. But in this instance it is paid to the party, for there can be no difference as to the payment to his agent. Then, how are you to get at it except through this agreement? There is nothing collateral, in respect of which, the agreement being out of the question, a collateral demand arises, as in the case of stock-jobbing differences. Here you cannot stir a step but through the illegal agreement; and it is impossible for the court to enforce it."

Brooks v. Martin, 2 Wall. 70, is relied upon by appellee to show that the contract and agreement between the parties had been fully executed and completed. There the parties were partners in buying up soldiers claims, contrary to law. When the suit was brought, all the claims of the soldiers illegally purchased by the partnership, with money advanced by the complainant, had been converted into land warrants, and all the warrants had been sold or located. The original defect in the purchase had in many cases been cured by the assignment of the warrant by the soldier after its issue. A large proportion of the land so located had also been sold, and the money paid for some of it, and notes and mortgages given for the remainder. There were, then, in the hands of the defendant, lands, money, notes, and mortgages, the results of the partnership business, the original capital for which plaintiff had advanced. It was to have an account of these funds, and a division of these proceeds, that the suit was brought. Upon this statement of the facts the court said:

"Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldier? It is difficult to perceive how the statute enacted for the benefit of the soldier is to be rendered any more effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner; or what rule of public morals will be weakened by compelling him to do so?

The title to the lands is not rendered void by the statute. It interposes no obstacle to the collection of the notes and mortgages. The transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case."

In support of these views, the court quotes in extenso from Sharp v. Taylor, supra, which closed with the statement that "the difference between enforcing illegal contracts and asserting title to money which has arisen from them is distinctly taken in Tenant v. Elliott and Farmer v. Russel, and recognized and approved by Sir William Grant ·in Thomson v. Thomson"; thus clearly indicating the class of cases to which the case then under consideration belongs. The distinction between the cases where a recovery can be had and the cases where a recovery cannot be had of money connected with illegal transactions, to be gleaned from all the authorities, is substantially this: That wherever the party seeking to recover is obliged to make out his case by showing the illegal contract or transaction, or through the medium of the illegal contract or transaction, or when it appears that he was privy to the original illegal contract or transaction, then he is not entitled to recover any advance made by him in connection with that contract or money due him as profits derived from the contract; but when the advances have been made upon a new contract, remotely connected with the original illegal contract or transaction, and the title or right of the party to recover is not dependent upon that contract, but his case may be proved without reference to it, then he is entitled to recover.

The doctrine of Brooks v. Martin and kindred cases is, and always should be, applied in cases where the fraud complained of is between individuals, which does not in any manner affect the public interest. If McMullen and Hoffman had agreed to continue their partnership, by investing the profits received by Hoffman under the illegal contract in the purchase of property, mortgages, bonds, or other securities, neither of them would be permitted, as against the other, to set up the fact that the money so invested was derived as profits from an illegal transaction, in which the rights of the public were involved. Numerous instances are found in the books which present the distinction existing between the two lines of cases under consideration in a very clear light.

In King v. Winants, the court, in reviewing the principles announced in Brooks v. Martin, 2 Wall. 70, said:

"Two men enter into a conspiracy to rob on the highway, and they do rob; and, while one is holding the traveler, the other rifles his pocket of $1,000, and then refuses to divide; and the other files a bill to settle up the partnership, when they go into all the wicked details of the conspiracy and the rencounter and the treachery. Will a court of justice hear them? No case can be found where a court has allowed itself to be so abused. Now, if these robbers had taken the $1,000, and invested it in some legitimate business as partners, and had afterwards sought the aid of the court to settle up that legitimate business, the court would not have gone back to inquire how they first got the money. That would have been a past transaction, not necessary to be mentioned in the settlement of the new business. And this illustrates the case of Brooks v. Martin, supra, so much relied on by plaintiff."

The learned counsel for appellee, recognizing the force of the reasoning of the authorities, admits, for the purpose of his argument,

that if, after the award was made to Hoffman, he had refused to enter into the partnership arrangement, McMullen could not have compelled him so to do, nor collect any damages for his refusal, "because the grounds then existing as the basis of appellee's claim would have been that he had rendered service in securing the award, and, necessarily counting upon that service, he would have had to bring it into the court, and its character would have been a subject for investigation. But, when Hoffman entered into the partnership agreement, all that matter, as between them, became a dead letter." If this position could be maintained, it would furnish a very convenient way for escaping the penalty which the law imposes upon all persons who have secured contracts in an illegal and unlawful manner. A contract secured by corrupt means—the bribing of public officers, buying off all rival bidders, thus stifling all competition where contracts are to be let to the lowest bidder—could always be enforced by a simple agreement of partnership by the parties guilty of the fraud. The fraud, under this rule, is a thing of the past,—has become "a dead letter," or is made honest by a single stroke of the pen, creating a new agreement to share and share alike in performing the illegal contract. What would there be left to discourage parties in their illegal combinations to defeat the ends of justice if this rule should be adopted and enforced by the court? The illegality of the contract could always be avoided as between the parties to the partnership agreement. We prefer to tread in the beaten path; to follow the safe road which has always been kept clean, in good condition and order, and furnishes a safe method of protection to the public who honestly travel thereon, and provides a penalty to all parties who depart therefrom by crooked ways, which naturally lead and always tend to destroy the public interests. It is manifest to every layman and lawyer, as well as to the courts, that such agreements would destroy all competition in the letting of contracts for public works. In the language of the authorities, such agreements are always declared void. Why? Because men with these agreements in their hands, and relying upon them for gain, do not act towards the public and third persons as they would without them, under the stimulus of competing opposition.

This suit is brought for an accounting between the parties of the profits realized on the contract made with the committee for the city of Portland upon its award to Hoffman & Bates upon the bid of Hoffman. The foundation of the case rests upon the legality of that contract. The case could not be proven without first showing the contract, and then proving the amount of money received and expended thereon. If Hoffman had admitted that a specified sum of money was due to McMullen, it may be that McMullen could have maintained an action upon an account stated between them. Hanks v. Baber, 53 Ill. 292; Chace v. Trafford, 116 Mass. 532; 1 Am. & Eng. Enc. Law (2d Ed.) 437. But it does not appear that any such admission has been made. No promise has been given by Hoffman to McMullen since the completion of the contract upon which a recovery is sought. This suit, as before stated, is for an accounting, and the amount found due in the circuit court was only ascertained, and could only be determined, by an investigation of the transaction between McMullen and

Hoffman arising out of the contract with the committee. The relief prayed for required the court to investigate all of the various transactions of the parties from the beginning to the end, and adjust the differences between them. We are called upon to examine all the evidence as to the manner in which they agreed with each other to put in their bids, and decide which was most faithless to the other, and determine which got away with the most of the spoils, and to help them make a just and equitable division. This is just what the courts in all cases of illegal contracts, agreements, or enterprises have universally refused to do. The act of Hoffman in refusing to divide the profits cannot be too strongly condemned. But it has often been said that courts are not organized to enforce the saying that there is honor among wrongdoers, and the desire to punish the man that fails to observe this rule must not lead the court to a decision that such persons are entitled to the aid of courts to adjust their differences arising out of, and requiring an investigation of, their illegal transactions.

The conclusions reached upon this branch of the case render it unnecessary to consider the question argued by counsel as to whether or not the partnership between Hoffman and McMullen was dissolved long prior to the completion of the contract, or to examine any of the questions presented in the cross appeal by McMullen against Hoffman. The views herein expressed are decisive of the whole case. The judgment and decree of the circuit court are reversed.