SAUL T. WOODSON *v.* JEREMIAH R. HOPKINS.

**EQUITY.** *Jurisdiction. Fraudulent conduct. Illegal contracts.*

A lender of money at extortionate rates of interest, under contracts which are void as against public policy, who establishes an agency for the carrying on of his nefarious business, cannot maintain a suit in equity against one who was placed by him in charge of such business for an accounting where he must call in the aid, directly or indirectly, of the illegal contracts to make out his case. *Gilliam* v. *Brown*, 43 Miss., 641, overruled.

FROM the chancery court of Warren county.

HON. WILLIAM P. S. VENTRESS, Chancellor.

Hopkins, appellant, was complainant, and Woodson, appellee, defendant in the court below. From a decree in complainant's favor the defendant appealed to the supreme court. The facts are fully stated in the opinion of the court.

*McLaurin & Thames,* and *McLaurin, Armistead & Brien,* for appellant.

Appellant's contention in this case is that the bill seeks to sustain appellee in carrying on an illegal business against the laws and public policy of the state, and that, this being true, he has no standing in equity under the rule, that he does not come into equity with clean hands. This proposition relates entirely to the right of the plaintiff to maintain this suit without reference to any acts of the defendant at all, and our first inquiry in this case is, What is the attitude of Hopkins, appellee, complainant in the court below, and whether or not he has any standing before this court, and will this court entertain or inquire into the acts of the defendant at all? If it be true that appellee, complainant in the court below, is undertaking to seek the aid of a court of equity to carry on an illegal business contrary to the laws and public policy of the state of Mississippi, on this fact, when once discovered, the court of its own motion would dismiss his bill and deny the relief. The doctrine that every plaintiff must come into a court of equity with clean hands has special reference to the question of conducting an illegal business and the enforcement of illegal contracts. By reference to 1 Pomeroy's Eq. Jur., 438, the court will find the following: "Another very common occasion for invoking the principle (of clean hands) is illegality. Wherever a contract or other transaction is illegal and the parties thereto are in contemplation of law in *pari delicto,* it is a well-settled rule, subject only to a few special exceptions depending on other considerations of policy, that a court of equity will not aid a *particeps criminis* either by enforcing the contract or obligation while it is yet executory, nor by relieving him against it, by setting it aside, nor by enabling him to recover the title and property which he has parted with by this means. The principle is thus applied in the same manner when the illegality is merely *malum prohibitum,* being in con-

travention to some positive statute, and when it is *malum in se,* and as being contrary to public policy or to good morals."

Hopkins cannot demonstrate to the court that he has any claim whatever against Woodson without resort to the illegal business carried on by him under the name of Shaw & Co., and the authorities are uniform that wherever an illegal business is being conducted, if in the assertion of any right the complaining party is compelled to resort to the illegal business to prove his rights to relief, then all relief will be denied him by the courts. This principle is announced in the leading case of *Gilliam* v. *Brown,* 43 Miss., 641.

The court will bear in mind that this case does not present the question of any executed transactions. There is no allegation in the bill that there are any funds in the hands of Woodson which have come into his hands through executed contracts carried on in such illegal business. On the contrary, the answer denies that there are funds arising from any transactions in carrying on the business of Shaw & Co. in the hands of said Woodson.

On page 660 of the case of *Gilliam* v. *Brown,* the court will find the following language: "The general principle laid down in a great number of cases is to this effect: that if the contract grows out of an illegal act a court of justice will not enforce it, but if the promise be unconnected with the illegal act and is founded on a new consideration, it is not tainted by the act."

"It has been observed that the test whether a demand connected with an illegal act can be enforced is, whether the plaintiff requires any aid from the illegal transaction to establish his case." And on page 661, *et seq.*: "Subjecting the case at bar to this test, it is manifest that the demand of W. T. Brown against his brother's estate must be traced back to the illegal traffic in the cotton, putting the claim in the simplest form of speech, and it takes this legal form." We contend, if the court please, that Hopkins can prove no rights to the court which are entitled to any protection whatever without falling within the test set forth

in the above quotation, which is by having a resort to the illegal business of Shaw & Co. In other words, he can predicate no rights arising out of the business of Shaw & Co. which would not involve the question of the manner of conducting the business of Shaw & Co., and that would bring to the knowledge of the court the fact that said business is carried on in violation of law, and therefore the court would at once decline to enforce any contracts or any rights, legal or equitable, growing out of such illegal business. Said Hopkins could not show the business relations existing between him and Woodson in reference to the business of Shaw & Co. without it becoming at once pertinent to inquire what kind of a business was that of Shaw & Co., in order to determine the status and rights of the respective parties, and when this is done the court necessarily becomes aware of the fact that the business of Shaw & Co. is illegal, and the doctrine of hands off at once applies. Replevin was instituted for all tangible property, as shown by the original bill.

On page 664 of the same opinion of *Gilliam* v. *Brown,* the court says: "So long as an illegal contract is *in fieri* in the course of execution, neither party can have a remedy grounded upon it, either for its enforcement or for damages for any breach of it," citing authorities. The court goes on in that opinion, and holds that where the contract has been executed, and one party is in possession of all the gain, then such party will not be heard to plead the illegality of such contract against a division of the gains, because, says the court, all the harm that can enure to the public by an infraction of the law has already accrued. But in this case this point does not arise, and it is not claimed in the bill that the defendant, Woodson, is in possession of any gains arising out of the conduct of the illegal business, but that he is claiming said business as his own, and undertaking to carry it on without reporting the conduct of it to the said Hopkins. It can make no difference that this suit is one in chancery, for, says the court in the same case above mentioned,

"This can make no difference, for a court of equity will no more .lend its aid to an iniquitous transaction than a court of law."

In the case of *McWilliams* v. *Phillips,* 51 Miss., 196, the court held, as stated in the syllabus, "Where all the parties participate in the violation. of law, the court will not, where the contract is executed, interfere for the relief of either party, but will leave them in their respective conditions. Where the contract is executory, the court will likewise refrain from lending its aid to carry it into effect." On this same point will be found the case of *Wooten* v. *Miller,* 7 Smed. & M., 380.

*W. J. Voller,* and *Catchings & Catchings,* for appellee.

It is contended that even admitting that Hopkins could recover his property in a court of law, notwithstanding the alleged illegality of the business, a court of equity will not grant him any relief upon the maxim that "he who comes into equity must come with clean hands."

The article of the Am. & Eng. Ency. Law on illegal contracts, from which most of the authorities cited by counsel were obtained, contains an elaborate description of what constitutes illegality in a contract in the sense of that chapter, and it is significant that it is not even suggested that contracts are illegal in that sense because they are usurious.

Illegal contracts cannot be enforced. Contracts evidencing loans of money at usurious interest can be enforced, except as to the interest provided for. Indeed, unless the defendant in a suit on a usurious contract pleads usury, the contract will be enforced as a whole. In the case of an illegal contract, or an immoral contract, the court will itself refuse to grant relief, although the illegality or immorality of the contract be not specially pleaded.

We submit that the very contracts which Woodson made as the agent of Hopkins, calling for usurious interest from the borrowers, were not in themselves illegal in the sense in which the cases cited by counsel used that term. How, then, can it be that

.a contract of employment can be adjudged so illegal as to be unenforceable merely because the employment contemplated the .exacting of usurious interest from third persons?

An examination of our statute on the subject of usury demonstrates that it was not intended to make the contract illegal. Section 2348, Code 1892, after defining what shall constitute the legal rate of interest, declares, "And if a greater rate of interest than ten per centum shall be stipulated for or received in any case, all interest shall be forfeited, and may be recovered back, whether the contract be executed or executory."

The only penalty imposed upon the making of usurious contracts is the forfeiture of the interest, and this penalty can only be enforced by the party from whom the usurious interest is exacted. The statute gives no right to any third person to assert any right or maintain any defense upon the ground of usury, and this was the rule at common law. .

"It is well settled by a multitude of decisions that the right to plead usury is a privilege personal to the debtor." 27 Am. & Eng. Ency. Law (1st ed.), 949. We submit, however, that if it were true that the contract of employment under which Woodson entered Hopkins' employ were in fact illegal, the situation of the complainant in this suit would be in no wise affected.

Counsel place great reliance upon the following portion of the text of the article on illegal contracts, 15 Am. & Eng. Ency. Law (2d ed.), 1010: "It has been held that if the agent transacts the illegal business without disclosing the fact of his agency, and the money is paid to him in his own right, and not as intermediary or agent, he cannot be compelled to account therefor to his principal, for the reason that the principal could not show his title to the property except through the illegal contract."

Three cases are cited in the note as sustaining this proposition, one of which is *Wooten* v. *Miller,* 7 Smed. & M., 380, which is strongly relied upon by counsel for defendant. We do not concede that this is a correct statement of the law, but submit that even if it be so, it has no application to the facts here

in controversy.  It should be noted that the authority is careful
to refrain from suggesting that this principle applies where an
agent is dealing as such for an undisclosed principal, the only
idea sought to be presented being that where an agent collects
money in his own right, and not as agent or intermediary, the
principal cannot recover if the fund arose from an illegal busi-
ness.  It is not disputed that all of the property here in contro-
versy was known as the property, not of Woodson, but of Shaw
& Co.  The business was done under that name, the office rented
under that name, the books kept in that name, the money ad-
vanced by, and the loans repaid to, Shaw & Co.  Woodson's
position, therefore, was necessarily that of the representative of
Shaw & Co.  The testimony shows that Shaw & Co. was Hop-
kins.  It was not illegal to do business under the name of Shaw
& Co.  Complainant can prove this fact without relying upon
any contract, legal or illegal.

While the case of *Wooten* v. *Miller, supra,* is cited as sus-
taining this proposition, an examination thereof will show that
this idea did not enter into the decision of the court in any way
whatsoever.  The question presented was simply whether or
not money paid to an agent by virtue of an illegal contract of
employment could be recovered by the principal, and the court
held that it could not, although the contract was fully executed.
The decision simply places contracts executory and contracts
executed upon precisely the same footing, and denies relief to
the principal in either case. No distinction is suggested or inti-
mated between money paid to an agent, as such, and paid to an
agent in his own right.  The case, therefore, is not authority for
the proposition to support which it is cited.  Indeed, in this
state it is not authority upon any point decided, for it has been
overruled by the case of *Gilliam* v. *Brown,* 43 Miss., 641, also
cited by counsel for defendant.  The facts of the two cases were
almost identical, while the rulings of the court were diamet-
rically opposed.

In the Wooten case the owner of a slave in North Carolina

placed him in the possession of one about to move to this state, to be sold or hired by him contrary to the laws of this state. The sale was effected, the contract executed, and the court held that the owner of the slave could not recover from his agent the price for which he was sold.

In the Gilliam case the owner of certain cotton during the civil war put it in possession of his brother to carry it through the lines of the contending forces, and sell it contrary to law. The sale was made, and the contract executed. The court held that, because it was executed, the owner of the cotton could recover the amount for which it was sold. This decision is in many ways directly in point to sustain our contentions, assuming that the contract here in controversy is illegal, as claimed.

WHITFIELD, C. J., delivered the opinion of the court.

The case made by the record is briefly this: That a certain Dr. Hopkins, of Atlanta, Ga., was the owner of a number of loan agencies in various states; a number in Memphis, Tenn., and a number in Vicksburg, Miss. They were conducted under assumed names: Cobb & Company, Shaw & Company, Mathis & Company, etc. Shaw & Company was the assumed name given to the office of Hopkins conducted by S. T. Woodson, as agent, in Vicksburg. The business consisted in loaning money in small sums to necessitous and ignorant people, mostly negroes; and this name of Shaw & Company was taken, evidently, for the purpose of preventing any borrower from suing to recover back usury paid, and was a disguise to hide the real person who had collected the usurious interest. This interest amounted to thirty-five per cent per week. A borrower, for example, would borrow, say, $10, and thirty-five per cent amounted to $3.50, which would be added to the $10 loaned, making $13.50, and this sum of $13.50 would form the consideration of a bill of sale of the borrower's household effects, and was required to be paid in one week. This unconscionable business seems to have resulted in large profits to Hopkins. Woodson claims, and

proves, by himself and a witness, Chaney, that he made an agreement with Hopkins, when last in Vicksburg, that upon the payment to Hopkins of $2,300 the business of Shaw & Company should become the property of Woodson; and Woodson testified that Hopkins only put in something over $1,000 originally, and that on the 7th of April, 1904, he had drawn out the sum of $2,300, and that by the terms of the agreement he then took the business and property of Shaw & Company, and declined to further account to Hopkins after that date. He also in his answer alleged that there were no executed transactions from which any money arose, and remained in his hands at the time of this suit, that he by law could be required to account to Hopkins for; and Hopkins, of course, wholly denies all the statements with respect to the purchase of the business. This suit was brought by him in the chancery court of Warren county against Woodson to recover moneys alleged to be the result of this business and remaining in Woodson's hands for him. Hopkins had Woodson arrested and imprisoned, and undertook to take charge of the business, and sued out an injunction against Woodson and others, enjoining them from having anything to do with the alleged property of Shaw & Company, and restraining them from collecting any of the amounts of money alleged to be due Shaw & Company, and from using the office in which the business had been transacted. Hopkins afterwards amended his bill, and the prayer of the bill was as follows:

"Complainant therefore prays that, pending this suit, a receiver may be appointed by this honorable court with full authority to take charge of all of the property which was used in and about the business of said Shaw & Company, including all office furniture and fixtures and all of the books and accounts and evidences of indebtedness belonging to or used in connection with the said business of Shaw & Company, and of the office in which said business was conducted, and that the defendants, S. T. Woodson, W. H. Sublett, and A. J. Gebhardt, or either of them who may have the same in his custody, may

be commanded and directed forthwith to deliver and turn over to the said receiver all property of every sort and description whatsoever pertaining to or growing out of the said business conducted under the name of Shaw & Company, as aforesaid, including all books, accounts, memoranda, route cards, and other evidences, showing what loans were made and to whom made, and what amounts have been paid thereon, and what amounts remain due thereon, and the places of residence of the persons making such loans from said Shaw & Company, and that said receiver be authorized and empowered to take and receive all of said property, and that he be directed to collect, as conveniently as may be, all sums of money which may be due and owing, as having been borrowed and obtained from the said Shaw & Company, and that he retain in his possession, to abide the final determination of this suit, the said office and all sums so collected by him, and all other property of every description which may come into his possession, as having pertained to the business of said Shaw & Company, directly or indirectly, until further order by this court."

Part of this prayer calls for, it will be observed, a direction that the receiver shall collect all sums of money which may be due and owing Shaw & Company, and the turning over to the said receiver of all books, accounts, etc., showing what loans were made, to whom made, what amounts had been paid thereon, what amounts remained due, and the places of residence of the persons making such loans. The final decree is as follows:

"Ordered, adjudged, and decreed that the injunction heretofore issued herein against the said defendants, S. T. Woodson, W. H. Sublett, and A. J. Gebhardt, be, and the same is hereby, made perpetual. It is further ordered, adjudged, and decreed that the said defendants deliver to the complainant herein, within ten days after the date of this decree, all books, memorandums, route cards, accounts, or evidences of indebtedness, and all other property of any and every sort and description which came into their possession, or into the possession of either

of them, as managers, agents, or employes in and about the business heretofore etablished in the city of Vicksburg, Mississippi, by the complainant under the name and style of Shaw & Company, and that they also pay over to the complainant all moneys which may have been collected by them growing out of the management and control by them of the business so conducted under the name of Shaw & Company."

The answer sets up the defense that the contract between Hopkins and Woodson, and these usury contracts—so extortionate as to shock the moral sense upon mere statement—were illegal and violated the public policy of this state, and that the bill, consequently, should not be maintained, but that the court of conscience, on well-settled principles, would leave these plunderers where it found them. Undoubtedly, the usury contracts, to the extent of the usury, were illegal and against public policy. 15 Am. & Eng. Ency. of Law, 939e. But aside from this feature, we hold, without hesitation, that no such robbing contracts as this record discloses can be other than against the public policy of the state, on account of their extortionate character. In 15 Am. & Eng. Ency. of Law, p. 933, par. 4, subd. 2, it is said: "While the chief sources for determining the public policy of a nation are its constitution, laws, and judicial decisions, still, however, these are not the sole *criteria*, and the courts should not hesitate to declare a contract illegal merely because no statute or precedent prohibiting it can be found."

We approve this as sound doctrine strictly applicable to the case made by this record. The true doctrine as to the inability of either party to a contract against public policy being permitted to invoke the aid of a court of law or equity is thus stated in the same authority (pages 998, 999, 1001) ; "Where illegal contracts are executed by the parties, then the same principle of public policy which leads courts to refuse to act when called upon to enforce them will prevent the court from acting to relieve either party from the consequence of the illegal transactions. In such cases the defense of illegality prevails, not as a

protection to the defendant, but as a disability in the plaintiff. The court does not give effect to the contract, but merely refuses its aid to undo what the parties have already done." "The fact that the party seeking to enforce executory provisions of an illegal contract, though they consist only of promises to pay money, has performed the contract on his part, and that, unless the other party is compelled to perform, he will derive a benefit therefrom, will not induce the court to enforce such provisions. Nor can the party performing, on his part, the provisions of an illegal contract, recover on the ground of an implied promise on the part of the party receiving the benefits therefrom to pay therefor, as the law will imply no promise to pay for benefits received under an illegal contract by reason of the performance thereof by the other party."

The same doctrine is admirably stated in 9 Cyc. of Law, 546: "No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim. The rule is expressed in the maxim, *'Ex dolo malo non oritur actio,'* and in *'In pari delicto potior est conditio defendentis.'* The law, in short, will not aid either party to an illegal agreement; it leaves the parties where it finds them. Therefore neither a court of law nor a court of equity will aid the one in enforcing it, or give damages for a breach of it, or set it aside at the suit of the other, or, when the agreement has been executed, in whole or in part, by the payment of money or the transfer of other property, lend its aid to recover it back. The object of the rule refusing relief to either party to an illegal contract, where the contract is executed, is not to give validity to the transaction, but to deprive the parties of all right to have either enforcement of, or relief from, the illegal agreement. While it may not always seem an honorable thing to do, yet a party to an illegal agreement is permitted to set up the illegality as a defense, even though it may be alleging

his own turpitude. Money paid under an agreement which is executed, whether as the consideration or in performance of the promise, cannot be recovered back where the parties are in *pari delicto*. And goods delivered or lands conveyed under an illegal agreement are subject to the same rule. Courts will not, even with the consent of the parties, enforce an illegal contract. And it would seem to follow that an illegal agreement cannot be rendered legal by ratification. An agreement void as against public policy cannot be rendered valid by invoking the doctrine of estoppel."

The distinction has been sought to be drawn, but only in some few cases, to the effect that, if a contract has been executed and one of the parties has the avails, all the harm that can be done to public policy has been done, and the party having the avails can be compelled to pay over the whole of them, or a proportionate share of them, to the other party. In 15 Am. & Eng. Ency. Law, 1011, it is stated as to partnership, "In some cases, however, the proposition has been advanced that, if the illegal purpose of the partnership has been accomplished, the courts may direct a division of the proceeds;" but the text repudiates this as unsound. *Gilliam* v. *Brown,* 43·Miss., 641, is one of the cases holding this repudiated view. The Cyclopedia of Law states the same doctrine as the American & English Encyclopedia of Law on this subject, noting, however, that there are "a number of decisions" holding like *Gilliam* v. *Brown,* but that is not the true view, saying, at page 559: "Theoretically, it is said by a recent writer, there is a distinction between enforcing an illegal contract and enforcing a duty not springing from the contract, but arising solely from the receipt of the money or goods. But practically it is impossible to reconcile the actual decisions on this point. A number of courts have refused to allow a recovery by a principal or partner in an illegal enterprise, on the ground that to do so would be to enforce, or at least to recognize, the illegal agreement"—and in a note appends a masterly statement of the true doctrine by

Jessel, M. R., in *Sykes* v. *Beadon,* 11 Ch. Div., 170: "The notion that because a transaction which is illegal is closed, therefore a court of equity is to interfere in dividing the proceeds of the illegal transaction, is not only opposed to principle, but to authority—to authority in the well-known case of the highwaymen, where a robbery had been committed, and one highwayman unsuccessfully sued the other for the division of the proceeds of the robbery. So in the case he puts of one of two partners engaged in merchant trade. As I read it, he meant the trade of smuggling goods. If two persons go partners as smugglers, can one maintain a bill against the other to have an account of the smuggling transaction? I should say, certainly not. It is not sufficient to say that the transaction is concluded, as a reason for the interference of the court. If that were the reason, it would be lending the aid of the court to assert the rights of the parties in carrying out and completing an illegal contract. If the partnership is for the purpose of smuggling, that is an illegal contract, and the court cannot maintain it, and the court will not lend its aid at all to it. That reasoning, then, of Lord Cottenham is not sufficient, and I should have answered the question not, as Lord Cottenham does, in the affirmative, but in the negative. I do not say that this observation at all affects the authority of *Sharp* v. *Taylor* as it stands, but I think it does affect very much the *dicta* which I have read from the judgment, and that is the reason I have read them. It is no part of the duty of a court of justice to aid either in carrying out an illegal contract or in dividing the proceeds arising from an illegal contract between the parties to that illegal contract. In my opinion no action can be maintained for the one purpose more than for the other."

The doctrine thus stated by that great jurist is also put unanswerably in *Hoffman* v. *McMullen,* 83 Fed., 372 (28 C. C. A., 178; 45 L. R. A., 410). See also 11 Cent. Dig., sec. 693, and authorities; *Myers* v. *Meinrath,* 101 Mass., 366 (3 Am. St. Rep., 368); *Edwards* v. *Randle* (Ark.), 38 S. W., 343 (36

L. R. A., 174; 58 Am. St. Rep., 108); *Kahn* v. *Walton,* 46 Ohio St., 195 (20 N. E., 203).

The test in all such cases is correctly stated in 15 Am. & Eng. Ency. of Law, 934, as follows: "Where a contract belongs to a class which is reprobated by public policy, it will be declared illegal, though in that particular instance no actual injury may have resulted to the public, as the test is the evil tendency of the contract, and not its actual result."

This demonstrates the utter fallacy of the statement in *Gilliam* v. *Brown, supra,* that, where such a contract has been executed, the courts will entertain a suit, because "all the harm that can be done to public policy has already been done." This is a gross misconception of the spirit of the rule. The courts leave violators of the law, as they ought to be left, in the condition where they find them. They are repelled by the courts because of the great supervening principle of public policy involved, without reference to the attitude which one of the parties may occupy to the other, where both are in *pari delicto.* As pungently put in *Hoffman* v. *McMullen, supra:* "Courts are not organized to enforce the saying that 'there is honor among wrongdoers,' and the desire to punish the man that fails to observe this rule must not lead the court to a decision that such persons are entitled to the aid of courts to adjust their differences arising out of, and requiring an investigation of, their illegal transactions."

The true doctrine was correctly put long ago in *Wooten* v. *Miller,* 7 Smed. & M., 386, the court saying: "We have nothing to say in behalf of the morality of the transaction nor in favor of those who make the defense; but as they interpose the law as a shield, we cannot do less than say it covers and protects them." And again in *Deans* v. *McLendon,* 30 Miss., 343, where the court said: "Courts of justice, in the observance of these rules, are not influenced by any considerations of respect or tenderness for the party who insists upon the illegality of a contract, but exclusively by reasons of public policy. The object

is to punish the active agent in the violation of a law by with-holding from him the anticipated fruits of his illegal act, and thus, by deterring all persons from violating its mandates, to give sanctity to the law and security to the public." And in *McWilliams* v. *Phillips,* 51 Miss., 196, where the court say: "If both, however, concur in the illegal act and are in equal fault, the modern doctrine is that a court will not entertain the claim of either against the other to carry into effect the illegal contract." And in *Williams* v. *Simpson,* 70 Miss., 115 (11 South., 689). We call special attention to the fact that in every one of these four Mississippi cases the contract was an executed one, the last one being the case of a merchant who merely failed to pay a sufficient privilege tax, and the one in 51 Miss., a case where a liquor dealer had simply failed to pay the required tax—cases where the acts were merely *mala prohibita.* The extraordinary circumstance about the case in 51 Miss. is that the opinion was delivered by the same judge who delivered the opinion in *Gilliam* v. *Brown,* in 43 Miss. In the case in 51 Miss., 197, the retail liquor dealer's case, Judge Simrall, speaking for a unanimous court, said: "All the parties participating in the violation of the law are in *pari delicto.* In such cases the courts will not, where the contract has been executed, interfere for the relief of either party, but will leave them in their respective conditions. Where a contract is executory, they will likewise refrain from lending aid to carry it into effect." And, a few lines below, Judge Simrall says that this doctrine, where the contract has been executed, as well as where it is executory, is the modern doctrine. We quite agree with this last statement, and the marvel is that whilst the case in 51 Miss. thus squarely overrules *Gilliam* v. *Brown,* eight volumes before, in 43 Miss., no allusion is made to the overruled case. It will thus be seen that in the four Mississippi cases cited above in 7 Smed. & M., in 30 Miss., in 51 Miss., and in 70 Miss. (11 South.), the doctrine—the true modern doctrine—is declared to be in accordance with the excerpts we have made

from the American & English Encyclopedia of Law and the Cyclopedia of Law, supported by innumerable citations, that neither a court of law nor a court of equity will entertain a suit by either party to an illegal contract against the other, where the contract is one against public policy, whether executed or executory.

It is true that in the case of *Howe* v. *Jolly*, 68 Miss., 323 (8 South., 513), and in the case of *Andrews* v. *N. O. Brewing Co.,* 74 Miss., 362 (20 South., 837; 60 Am. St. Rep., 509), the court followed *Gilliam* v. *Brown,* 43 Miss., 641; but it is also true that those cases limped along after that case, without the citation of a single authority and without a single line of reasoning, when, if the court had simply examined the four cases referred to in our reports, and especially the case in 51 Miss., it would have seen that *Gilliam* v. *Brown* had been overruled, and the doctrine of 7 Smed. & M. and 30 Miss. reinstated as to executed contracts; and it would have also noted the pregnant fact that the judge who wrote the opinion in 43 Miss. apologized for it in 51 Miss. by saying that the view established in Mississippi before the case of *Gilliam* v. *Brown,* reinstated and thoroughly approved in the cases we have referred to in 51 Miss., 196, and 70 Miss., 113 (11 South., 689), was the "true modern doctrine." *Gilliam* v. *Brown* having thus manifestly been overruled by these two last-named cases, the two cases in 68 Miss. (8 South.) and 74 Miss. (20 South., 60 Am. St. Rep.), having inadvertently followed an overruled case, we declare the law in Mississippi now to be as it was stated to be in the four cases: *Hoover* v. *Pierce,* 26 Miss., 627; 30 Miss., 343; 51 Miss., 196; and 70 Miss., 113 (11 South., 689)—viz.: That neither a court of law nor a court of equity, in this state, will entertain a suit for relief by either of two parties in *pari delicto* against the other, where the contract is against public policy. The plain truth is, on principle, that the contrary doctrine holds out a premium to those who violate the law, since, according to that doctrine, if they can only hurry fast enough

to consummate their villainy, the law will help one to get from the other his part of the stolen plunder. In further demonstration of the inaccuracy of the opinion in *Gilliam* v. *Brown* we call attention to two other misstatements of the law therein contained. It is said at page 660 of that opinion: "A bond or deed made for a past cohabitation is good." The American & English Encyclopedia of Law, Vol. 15, p. 961, says: "This obligation on the part of the man, however, cannot rise above a moral obligation on his part; and as a moral obligation is, as a rule, insufficient to support a contract, it is therefore held by the weight of authority that past cohabitation alone is not sufficient consideration for a promise, not under seal, by the man to remunerate the woman."

The other misconception is in confusing the case of a suit by one of two parties to an illegal contract against the other with a suit by one of the parties against a third party, no way connected with the illegal contract, to collect money paid by the other party to the illegal contract, which has been executed, to such third person for the use of the party suing. This principle is clearly stated at p. 1007, Vol. 15, Am. & Eng. Ency. Law, par. 9, and it is stated there, with great exactitude of statement, that the reason that the third person cannot defend an action by the latter is "that in such a case the action is not based on the illegal contract, but, instead, upon the independent contract of such third person to deliver over the property received by him."

The same principle is also clearly stated in 9 Cyc. of Law, 563. In all such cases the case is made out quite independently of any reference to the illegal contract; the suit is on a new promise based upon a new consideration. A striking statement of the principle is found in note 96, p. 560, of the latter authority, where it is said: "The status of such a case has been well put thus: Two men enter into a conspiracy to rob on the highway, and they do rob, and while one is holding the traveler the other rifles his pockets of $1,000, and then refuses to divide,

and the other files a bill to settle up the partnership, when they go into all the wicked details of the conspiracy and the rencounter and treachery. Will a court of justice hear them? No case can be found where a court has allowed itself to be so abused. Now, if these robbers had taken the $1,000 and invested it in some legitimate business as partners, and had afterwards sought the aid of the court to settle up that legitimate ·business, the court would not have gone back to inquire how they first got the money; that would have been a past transaction, not necessary to be mentioned in the settlement of the new business."

In the unanswerable opinion of Hawley, district judge of the United States circuit court of appeals, *Hoffman* v. *McMullen,* 83 Fed., 384 (28 C. C. A., 190; 45 L. R. A., 418), the doctrine is thus stated: "In support of these views, the court quotes *in extenso* from *Sharp* v. *Taylor,* 2 Phill. Ch., 801, 817, which closed the statement that 'the difference between enforcing illegal contracts and asserting title to money which has arisen from them is distinctly taken in *Tenant* v. *Elliott* and *Farmer* v. *Russel,* and recognized and approved by Sir William Grant in *Thomson* v. *Thomson,*' thus clearly indicating the class of cases to which the case then under consideration belongs. The distinction between the cases where a recovery can be had, and the cases where a recovery cannot be had, of money ·connected with an illegal transaction, to be gleaned from all the ·authorities, is substantially this: That wherever the party seeking to recover is obliged to make out his case by showing the illegal contract or transaction, or through the medium of the illegal contract or transaction, or when it appears that he· was privy to the original illegal contract or transaction, then he is not entitled to recover any advance made by him in connection with that contract, or money due him as profits derived from the contract; but that when the advances have been made upon a new contract remotely connected with the original illegal contract or transaction, and the title or right of the party to recover is not

dependent upon that contract, and his case may be proved without reference to it, then he is entitled to recover."

The distinction between the class of cases is clearly set forth in *Thomson* v. *Thomson,* 7 Ves. Jr., 470. The master of the rolls, after declaring that the agreement there under consideration was illegal, said: "There is an equity against the fund, I admit, if you can get it by a legal agreement. The defense is very dishonest, but in all illegal contracts it is against good faith, as between the individuals, to take advantage of that. A man procures smuggled goods and keeps them, but refuses to pay for them. So, in the underwriter's case, an insurance contrary to the act of parliament, the brokers had received the money and refused to pay it over, and it could not be recovered. No matter who complains of it, the thing is illegal. You have no claim to this money except through the medium of an illegal agreement, which, according to the determinations, you cannot support. I should have no difficulty in following the fund, provided you could recover against the party himself. If the case could have been brought to this, that the company had paid this into the hands of a third person for the use of the plaintiff, he might have recovered from that third person, who could not have set up this objection as a reason for not performing his trust. *Tenant* v. *Elliott* is, I think, an authority for that. But in this instance it is paid to the party, for there can be no difference as to the payment to his agent. Then how are you to get at it except through this agreement? There is nothing collateral in respect of which, the agreement being out of the question, a collateral demand arises, as in the case of stock-jobbing differences. Here *you cannot stir a step but through that illegal agreement,* and it is impossible for the court to enforce it."

As remarked in this last citation, in the case at bar, as in the case of *Thomson* v. *Thomson,* the payment to Woodson, the agent, was payment to Hopkins.

The third mistake in the opinion of *Gilliam* v. *Brown* is the

statement that one partner in the case of an executed contract, with the avails of an illegal contract in his hands, may be made to account to the other partner for his proportionate part. In 15 Am. & Eng. Ency. Law, par. 10, p. 1008, it is said: "Where several persons as co-parties enter into an illegal contract, which is executed, and one of such co-parties receives the profits of the contract or fund raised by such contract, it has been held that the courts will not compel him to account to the other co-parties for their share of such profits, as their right to share therein is undoubtedly based upon the illegal contract, and permitting the recovery of their shares would be an enforcement of a part of such contract." And at p. 1011, par. 2, the same doctrine is announced.

We may also observe, in passing, that in Am. & Eng. Ency. Law, 1010, note 3, *Wooten* v. *Miller,* 7 Smed. & M., 380, is cited as holding: "That if an agent transacts the illegal business without dsclosing the fact of his agency, and the money is paid to him in his own right, and not as an intermediary or agent, he cannot be compelled to account therefor to his principal, for the reason that the principal could not show his title to the property except through the illegal contract."

And the principle is universal that one party to an illegal contract can have no accounting from the other, where he must call in the aid, directly or indirectly, of the illegal contract to make out his case. It is curious to note in 15 Am. & Eng. Ency. Law, 1012, that some courts have held that "where the illegal business transacted by the partnership results in losses, and one of the partners has advanced more than his proportion, he cannot force the other partners to reimburse him." This strengthens the position that partners, no more than others, can enforce contracts against public policy, executory or executed. This last statement of the principle as to recovery of losses is the mere complement of the other as to the recovery of profits.

A careful reading of the pleadings and the record, the evidence and the decree, in this case, makes it plain that this suit

cannot be maintained, except by the use and through the aid of the illegal contract itself, and that, in effect, a decree of affirmance would be a decree assisting in the carrying forward of this unconscionable and illegal scheme.

*Reversed and bill dismissed.*


SUGGESTION OF ERROR.

After the rendition of the foregoing opinion, *Catchings & Catchings,* and *W. J. Voller,* for appellee, filed the following suggestion of error:

"We respectfully suggest that the court erred in reversing the decree of the chancery court in this case. First—The record in this case does not disclose any contract whatever which is illegal in the sense in which this term is used by text writers or in such degree as to render it void as against public policy. Second—If the record discloses a contract illegal, and therefore void as against public policy, the rights asserted and relief prayed for by the complainant in the court below (appellee here) are not based upon, and do not arise under, said contract, but are wholly collateral thereto and independent thereof.

"First—The record shows that appellee entered into a contract with appellant by which the latter was employed to lend money to various persons, and to collect, account for, and pay over the proceeds to appellee. The court's opinion is to the effect not only that the contracts of loan which appellant made to the customers of the concern were illegal and void because usurious, but that the illegality of these contracts must be imputed back to the contract of employment by virtue of which appellant got possession of appellee's funds, and, being so imputed back, so infect this contract as to render it also illegal and utterly void. We submit that this is not the law, and cannot be, in this state. We contend that the contracts of loans were themselves not illegal and void under the laws of this state. The court, in support of its conclusion that the contracts are

illegal and void, cites 15 Am. & Eng. Ency. Law, p. 933, par. 4, subd. 2, as follows: 'While the chief sources for determining the public policy of a nation are its constitution, laws, and judicial decisions, still, however, these are not the sole *criteria,* and the courts should not hesitate to declare a contract illegal merely because no statute or precedent prohibiting it can be found.' We concede that, if the statute did not in itself undertake to declare just what should be the effect of usurious contracts, it might perhaps be in the discretion of the courts to adjudge them void as against public policy. But inasmuch as our statute on the subject of usury not only does not prohibit the making of usurious contracts, nor declare them void, but, in express terms, fixes and defines the consequences and penalties which shall follow the making of such contracts, as the forfeiture of the interest, we insist that it is not within the powers of the court to decree a different and higher penalty. Our view is borne out by the very authority cited. 15 Am. & Eng. Ency. Law, p. 941, par. 5, subd. 'h.' Among the cases cited is that of *Oats* v. *National Bank,* 100 U. S., 249 (25 L. ed., 580), in which it was sought to have the court declare a usurious contract void. There are also cited *Lazear* v. *National Bank,* 52 Md., 78 (36 Am. St. Rep., 355); *First Nat. Bank* v. *Childs,* 133 Mass., 248 (43 Am. St. Rep., 509); *Pratt* v. *Short,* 79 N. Y., 437 (35 Am. St. Rep., 531); *Columbus Bank* v. *Garlinghouse,* 22 Ohio St., 492 (10 Am. St. Rep., 751)—in all of which the same attempt was made to have usurious contracts declared void, and in all of which the courts held that it was beyond their power to add other penalties or give different effect to the contracts than those fixed by the statutes. See also *Harding* v. *Am. Glucose Co. et al.,* 182 Ill., 551 (55 N. E., 577; 64 L. R. A., 738; 74 Am. St. Rep., 189). Appellee could have recovered from the persons to whom the loans were made the principal loaned, yet, under the opinion of the court, he is not permitted to recover from his agent who made the loans the very principal which he could have recovered from the persons from

whom the usurious interest was extorted. Not only this; he is not permitted to reclaim the very books of account and office furniture which under the finding of fact of the lower court belonged to him, because they were used by his agent in connection with the business of loaning money at usurious rates of interest. In other words, appellee is subjected to a complete forfeiture not only of his principal and interest, but of all his other property used in connection with the business, merely because usury was exacted. And this not at the instance of the borrowers, whom alone the usury statutes are intended to protect, but upon the plea of a third person, with whose welfare the statutes have no concern. In 29 Am. & Eng. Ency. Law, p. 532, it is said: 'The defense of usury is not a defense favored by the courts, either of law or equity.' Again, p. 534, same volume: 'The defense of usury is personal to the debtor and his privies, and cannot, as a general rule, be set up by a stranger, as the object of the usury statutes is the protection of the borrowers, who may waive their benefits.' This court has held that under certain circumstances a person may be estopped from setting up usury as a defense. *Henderson* v. *Hartman*, 65 Miss., 466 (4 South., 549). See also 15 Am. & Eng. Ency. Law, p. 1014. It may be that appellee in this case was engaged in a business 'so extortionate as to shock the moral sense upon mere statement,' but the court should not permit itself to be led by this fact into the imposition of a different penalty than that provided by the statute. Under the statute, no greater penalty can be imposed for the charge of 1,000 per cent interest than for the charging of 11 per cent interest, and the consequence which follows the habitual violation of the statute against usury is precisely the same as that which results from the first offense.

"Second—If we are wrong in our contention that the record discloses no illegal contract, we submit that the rights of appellee are not founded upon such illegal contract. In this case it was not necessary to prove any contract, it being sufficient to

show the ownership of the property in complainant. So far as we know, the authorities are entirely harmonious to the effect that, where an illegal contract is merely collaterally connected with or incidentally involved in a transaction, the courts will not withhold their relief. The court cites the general statement of law relating to illegal contracts contained in 9 Cyc. Law, p. 456, overlooking, it seems, the fact that certain exceptions are there stated. One of the exceptions is found on p. 557 under the heading: 'g. Persons in Possession of Profits of Illegal Transactions.' We respectfully submit that the citation from 15 Am. & Eng. Ency. Law, p. 1011, is not applicable. That portion of the text relates solely to accounting between partners. The court, in its opinion, says that the case of *Howe* v. *Jolly,* 68 Miss., 323 (8 South., 513), and *Andrews* v. *N. O. Brewing Co.,* 74 Miss., 362 (20 South., 837; 60 Am. St. Rep., 509), limped along after *Gilliam* v. *Brown,* 43 Miss., 641, without the citation of a single authority; having inadvertently overlooked the fact that *Gilliam* v. *Brown* had been overruled in *McWilliams* v. *Phillips,* 51 Miss., 196. We wish to call the attention of the court to the fact that *Gilliam* v. *Brown* was in terms reaffirmed in the case of *Walker* v. *Jeffries,* 45 Miss., 165, and *Gary-Hudson & Co.* v. *Jacobson,* 55 Miss., 207. (30 Am. St. Rep., 514). It was also cited with approval in the very late case of *Fewell* v. *Surety Co.,* 80 Miss., 791 (28 South., 755; 92 Am. St. Rep., 625), and *Knut* v. *Nutt,* 83 Miss., 365 (35 South., 686). There can be no question that the effect of the opinion of the court in this case is not only to overrule the case of *Gilliam* v. *Brown,* in 43 Miss., but the cases in 45 Miss., 55 Miss., 68 Miss., 80 Miss., and 83 Miss., which affirmed it."

## RESPONSE TO SUGGESTION OF ERROR.

WHITFIELD, C. J., delivered the response of the court to the suggestion of error.

It is said in the suggestion of error that our opinion "is to the effect not only that the contracts of loan which appellant

made with the customers of the concern were illegal and void because usurious, but that the illegality of these contracts must be imputed back to the contract of employment by virtue of which appellant got possession of appellee's funds, and, being so imputed back, so infect this contract of employment as to render it also illegal and utterly void." Learned counsel misconceive. We did not declare these contracts—either the one between Woodson and Hopkins, or those between Woodson, as agent for Hopkins, and borrowers — unenforceable because merely usurious. We expressly said that they were so declared because they were unconscionable, so highly extortionate as to shock the conscience upon the mere statement of them; and we referred to 15 Am. & Eng. Ency. Law, p. 933, par. 4, subd. 2, for authority. We said nothing at all about the mere usurious nature of the contract, except that, to the extent of usury, it was, of course, illegal. Again, it is said Hopkins "is not permitted to reclaim the very books of account and office furniture, but is subjected to a complete forfeiture," etc., and "that this penalty is imposed upon him at the instance, not of the borrowers, whom alone the usury statutes were intended to protect, but upon the plea of a third person, with whose welfare the statutes on the subject of usury have no concern." There is no question of forfeiture in the case. It is a case of inability to sue. Hopkins has placed himself in a position where he cannot call upon a court of conscience to enforce his demands, because they are against public policy, by reason of their iniquitous and extortionate character; and this penalty, if it be a penalty, is self-inflicted, and his contracts are declared unenforceable in any court in this state not because they are usurious, but because they are so utterly oppressive and extortionate as that no court should enforce them. It is said again in the suggestion of error "that, if it be true that this business was so extortionate as to shock the moral sense upon mere statement, the court should not therefore permit itself to be led by this fact into the imposition of a different penalty than that provided by the statute; that under the

statute no greater penalty can be imposed for the charging of 1,000 per cent interest than for the charging of 11 per cent interest." This discloses a failure on the part of counsel to apprehend accurately the exact ground on which the opinion proceeded, and, indeed, this misconception pervades the entire suggestion of error. The mistake learned counsel make is in not distinguishing between a contract merely usurious, and a contract, like this one, which not only provides a rate of interest so outrageous that the mere usury feature is lost in the grossness of its general iniquity, but also provides bills of sale on all household effects, kitchen furniture, etc., of neccessitous borrowers, under which property worth, it might be, a hundred times the loan, may be confiscated in a week's time. It is not a case of ordinary usury, but a case of extraordinary wrong and oppression. Again, counsel say: "Under the statute, no greater penalty can be imposed for the charging of 1,000 per cent interest than for the charging of 11 per cent interest." Most true, "under the statute." But we are not dealing with this case under a usury statute, merely. We are dealing with this case as what it clearly is—to wit, a case in which the usury statute is a mere guise, under cover of which the helpless and defenseless may be robbed by contracts unenforceable because against public policy, not for that they are usurious, but for that they result in gross wrong and oppression of the weak and defenseless, whom courts were established to protect.

Learned counsel do not so much urge that the case (*McWilliams* v. *Phillips*) in 51 Miss., 196, does not overrule *Gilliam* v. *Brown,* in 43 Miss., 641, for they style the opinion in 51 Miss., "inconclusive and contradictory," as that *Gilliam* v. *Brown* has been followed in the other cases to which we referred as limping lamely after *Gilliam* v. *Brown,* and also in three other cases referred to by them: *Walker* v. *Jeffries,* 45 Miss., 160; *Gary* v. *Jacobson,* 55 Miss., 207 (30 Am. St. Rep., 514); *Knut* v. *Nutt,* 83 Miss., 365 (35 South., 686). As to the first case (45 Miss., 160), the opinion was delivered by Tarbell, J., and merely fol-

lowed *Gilliam* v. *Brown,* prior to the case in 51 Miss., which overruled it.    As to the second of the above cases (*Gary* v. *Jacobson*), that was a case of fraudulent conveyance assailed by creditors, and wholly out of point in this discussion.    The court pointed this out at p. 207, 55 Miss. (30 Am. St. Rep., 514), saying: "There is a manifest distinction between conveyances in fraud of creditors, and offenses against the penal law.    By one the body politic, the sovereign commonwealth, is wronged; by the other, those only who have an interest in undoing the fraud, and this number is limited in our state to pre-existing creditors." And the case at bar is of the class named as being against public policy.    In the third case (*Knut* v. *Nutt*), after deciding the case on the right ground, it is true the case of *Gilliam* v. *Brown* was cited, but that case (*Knut* v. *Nutt*) went off on a ground wholly independent of the doctrine of *Gilliam* v. *Brown.*    That ground was this: That in order to disconnect the government from quarrels between claimants and their attorneys, growing out of the transfers or assignments of claims, or interests therein, and powers of attorney for receiving payment of the same, sec. 3477, Rev. St. U. S. (U. S. Comp. St. 1901, p. 2320), provided that all such transfers, etc., should be void unless made after the allowance of such claims. In the Knut case the government had paid the money, and had nothing to do with the contest between counsel and his client, subsequently arising.    The purpose of the government, as stated expressly in the Knut case, was to provide by this section (sec. 3477) for ridding itself of all inconveniences arising out of claims transferred before it had paid the money.    It resulted from the statute that the government and its department officers ceased to be involved in injunction and other embarrassing legal procedure, and established for itself, as stated in the Knut case, an easy system of bookkeeping between itself and the claimants direct.    The claim having been allowed, and the amount paid by the government, its books were closed, and it had nothing to do

with subsequent troubles between counsel and client; and this is our holding in the Knut case, and it is perfectly obvious that the doctrine of *Gilliam* v. *Brown* had nothing to do with that holding.

*Suggestion of error overruled.*